**FOREMOST DAIRIES, INC., Petitioner,**

v.

**FEDERAL TRADE COMMISSION,**
Respondent.

No. 20726.

United States Court of Appeals
Fifth Circuit.

July 14, 1965.

Milam, LeMaistre, Ramsay & Martin, by George W. Milam, Jacksonville, Fla., White & Case, by Edgar E. Barton, Macdonald Flinn, Thomas B. Leary, New York City, for petitioner.

J. Lane Northland, Atty., F. T. C., J. B. Truly, Asst. Gen. Counsel, F. T. C., James McI. Henderson, Atty., F. T. C., Washington, D. C., for respondent.

Before TUTTLE, Chief Judge, GEWIN, Circuit Judge, and McRAE, District Judge.

GEWIN, Circuit Judge.

The petitioner, Foremost Dairies, Inc., is a processor, manufacturer, distributor, and retailer of dairy products in interstate commerce. As of June 1959 it owned and operated 59 processing plants in 24 states and maintained 182 sales, receiving and distribution facilities in 29 states. On May 23, 1963, the Federal Trade Commission ordered Foremost to cease and desist from discriminating "in the price of fluid milk of like grade and quality by selling to any purchaser at net prices higher than the net prices charged any other purchaser who competes with the purchaser paying the higher price." This order, which was premised on the Commission's finding of unjustified discrimination in the wholesale prices that Foremost charged in its sales of fluid milk in the Albuquerque, New Mexico, market, is before us for review.[1] The petition presents three questions for our consideration: (1) whether the Commission properly found a "purchase in commerce" within the meaning of the Act; (2) whether the Commission's inference of a probable competitive injury was supported by substantial evidence; (3) whether the order entered by the Commission was too sweeping in light of the nature of the particular activities which it found transgressed the Act.

The advantageous prices were given by Foremost to Barber's, a retail grocery establishment which at the time of the hearing operated about eight stores in Albuquerque. The evidence indicates that, for a two-year period beginning in November 1959, Foremost granted a discount of 5% on its sales of fluid milk to Barber's stores, while it gave no similar price advantage to any of its independent grocer customers in the Albuquerque market.[2] The discount was originally granted when Barber stopped purchasing Foremost milk because in Barber's esti-

[1.] The price differentials were deemed violative of sec. 2(a) of the Robinson-Patman Act, 15 U.S.C.A. § 13(a), which provides in part as follows:

"That it shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce * * * and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them * * *."

[2.] There was evidence that similar discounts were granted to two other retail grocery chains in Albuquerque, but the FTC held that these price advantages did not violate The Robinson-Patman Act. These findings by the Commission are not in issue in the petition for review.

mation Foremost was not "competitive." Without attempting to ascertain whether its competitors were also giving discounts or attempting to determine the amount of those discounts, Foremost granted Barber's a 5% cash rebate on its purchases of Foremost products.[3] The rebates were not discontinued until November 1961, and they amounted to cash payments from Foremost to Barber's of $7627.11 between their inception in November 1959 and April 1961, an average of well over $400.-00 per month. The discriminations ceased only when Foremost fortuitously discovered that all of its competing distributers in the Albuquerque area had discontinued any form of price concessions.

■ Our standard of review is clear. 15 U.S.C.A. § 21(c). The facts found by the Commission if supported by substantial evidence, must be accepted, and it is not our function to weigh the evidence or consider the credibility of witnesses. Furthermore, reasonable inferences drawn from the facts by the Commission are not to be disturbed. See e. g., FTC v. A. E. Staley Mfg. Co., 324 U.S. 746, 760, 65 S.Ct. 971, 89 L.Ed. 1338, 1347 (1945); FTC v. Algoma Lumber Co., 291 U.S. 67, 54 S.Ct. 315, 78 L.Ed. 655 (1934); FTC v. Pacific States Paper Trade Ass'n, 273 U.S. 52, 63, 47 S.Ct. 255, 71 L.Ed. 534, 538 (1927).

## I. INTERSTATE COMMERCE

Foremost makes an initial attack on the jurisdiction of the Commission over the discounts in question, asserting that the evidence does not establish that "any of the purchases involved in such discrimination [were] in commerce" as required by section 2(a). It is conceded that the other operative jurisdictional prerequisite of section 2(a)—that the discriminating

seller be "engaged in commerce"—is satisfied in the instant case.

When Congress enacted the Sherman Act, it intended to exercise its fullest powers under the commerce clause in proscribing all restraints of trade which "affect interstate commerce," but the Robinson-Patman Act is operative only in a more restrictive context. Nevertheless, whenever it can be demonstrated that one of the purchases involved in the discrimination was made in interstate commerce and that the person making the discrimination was engaged in commerce, there is jurisdiction to enter a cease and desist order. The underlying principles applied in defining the term "in commerce" or "stream of commerce" under all three acts (Sherman, Clayton, and Robinson-Patman) are substantially identical. "The statute [Robinson-Patman] applies to all forms of interstate commerce, in whatever sense the commerce in question might be considered interstate." Toulmin's Antitrust Laws (1949), V. 2, § 7.5, P. 45.

In the instant case, the record reveals that about 20% of the milk which Foremost supplied to its Albuquerque customers was produced in Colorado. Ordinarily, Foremost purchases its supply of raw milk from associations of dairymen, and it is shipped to the Foremost processing plaint in Sante Fe, New Mexico.[4] There it is unloaded from the trucks, tested, standardized to a uniform butterfat content by the addition of other milk of a predetermined butterfat ratio, pasteurized, in some cases homogenized, and bottled. From the Santa Fe processing plant it is shipped in trucks to Foremost's Albuquerque distributing branch, where it is delivered to the customers for resale. One witness testified that a truck tank of raw milk is usually processed in less than an hour and that "in general the milk

---

3. Foremost's attempt to qualify these rebates under the "meeting competition" defense of sec. 2(b) of The Robinson-Patman Act, 15 U.S.C.A. § 13(b), or the "cost justification" defense of sec. 2(a) were unsuccessful. The FTC's conclusions with respect to these defenses are not challenged on appeal.

4. The testimony in the record all related to Foremost's processing operations in Dallas, but it is not contended that its Santa Fe processing plant was operated in a different fashion.

moves in and out the same day." The hearing examiner found that there was a "constant flow" of milk which originated outside of New Mexico, and that this milk remained in interstate commerce from its point of origin until delivery to Foremost's wholesale customers in Albuquerque.

■ We think the sales in the instant case were "in commerce" as that phrase is used in section 2(a) of the Robinson-Patman Act. It is well established that Congress may restrict uses of interstate commercial transactions which result in what it considered an undesirable effect on purely intrastate activities. Consistent with this aim of the Act in protecting against secondary-line injury, the courts have generally construed the word "purchase" without regard to its technical legal attributes, such as the point at which title passes. See Olympia Food Market, Inc. v. Sheffield Farms Co. (S.D. N.Y.) 1955 Trade Cas. 70442.[5] Likewise, courts have often applied the so-called "stream of commerce" doctrine in section 2(a) cases. See, e. g., Standard Oil Co. v. FTC, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951); Olympia Food Market, Inc. v. Sheffield Farms Co., supra, cf., Hardrives Co. v. East Coast Asphalt Corp. (5 Cir. 1964) 329 F.2d 868.

In the instant case the milk passed in a steady flow from the farms in Colorado through the Santa Fe processing plant, where it underwent a rather negligible processing operation, which did not change its character appreciably, to the shelves of retail grocery establishments in Albuquerque.[6] Indeed, other courts of appeals have stated that, under the stream of commerce doctrine, milk produced in one state and processed and distributed in another state does not lose its interstate character because of standardization, and pasteurization. See Universal Milk Bottle Service v. United States (6 Cir. 1951) 188 F.2d 959; Pevely Dairy Co. v. United States (8 Cir. 1949) 178 F. 2d 363.[7] Furthermore, we think the de-

5. Nevertheless, in cases in which only a secondary-line injury was shown, the courts have always carefully limited the application of the phrase "purchase in commerce" to those purchases directly involved in the discrimination. Either the purchase by the favored customer or one or more of his disfavored competitors must be made in interstate commerce. Therefore, it has been held that jurisdiction under the Robinson-Patman Act may not be established merely by showing that some of the discriminating company's sales are made across state lines. See Borden Co. v. FTC (7 Cir. 1964) 339 F. 2d 953; Jones v. Metzger Dairies, Inc. (5 Cir. 1964) 334 F.2d 919; Willard Dairy Corp. v. National Dairy Prods. Corp. (6 Cir. 1962) 309 F.2d 943, cert. denied, 373 U.S. 934, 83 S.Ct. 1554, 10 L.Ed.2d 691 (1963). It has been suggested that a more expansive interpretation would be consonant with the statutory purpose behind regulation of injuries in the primary line of competition. See Moore v. Mead's Fine Bread, 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954); Borden Co., No. 7474, 3 CCH Trade Reg. Rep. ¶ 16776, at 21723 (1964) (dissenting opinion of Commissioner Elman).

6. Petitioner relies upon a number of cases in which raw materials used in the man-

ufacture of a product had moved across state lines although all the sales in question were made in the same state in which the ultimate product was manufactured. See Central Ice Cream Co. v. Golden Rod Ice Cream Co. (7 Cir.) 287 F.2d 265, cert. denied, 368 U.S. 829, 82 S.Ct. 50, 7 L.Ed.2d 32 (1961); Brosious v. Pepsi-Cola Co. (3 Cir. 1946) 155 F.2d 99; Ewing-Von Allmen Dairy Co. v. C & C Ice Cream Co. (6 Cir. 1940) 109 F.2d 898. In contradistinction to these cases, the raw milk which arrived each day from outside New Mexico was not altered materially by the processing in Santa Fe, and the milk was not warehoused for any appreciable length of time before shipment. We feel this serves as an adequate distinction between these cases and the instant one.

7. Foremost urges that these cases should not persuade us, since they involved indictments under the broader terms of section 1 of the Sherman Act, where the Government need only demonstrate that the defendant's activities had an effect on interstate commerce. This observation is certainly apropos to the Universal Milk Bottle case, where the indictment alleged that the fixing of prices of milk sold by defendants in Cincinnati had the effect of reducing the volume of milk which de-

cision of the Supreme Court in Standard Oil Co. v. FTC, 340 U.S. 231, 71 S.Ct. 240, 95 L.Ed. 239 (1951) requires the conclusion that the sales in the instant case were in interstate commerce. In that case, which was also brought under section 2 (a) of the Robinson-Patman Act, gasoline produced in Kansas and refined in Indiana was shipped to Michigan, where it was stored in tanks before delivery to Standard's customers in Michigan. It was established that the demands of the Michigan territory were fairly constant. The Court, applying the stream of commerce doctrine, held that these deliveries to individual customers in Michigan constituted sales in interestate commerce, even though the gasoline was stored for some time prior to distribution to retailers.

■ In the case before us, the fluid milk undergoes a rather negligible processing,[8] in general moving in a constant flow from the Colorado dairy farms to meet the fairly predictable demands of the retail grocers in Albuquerque. This processing no more interrupts the flow of commerce than the temporary storage of the gasoline in the Standard Oil case. See also Olympia Food Market, Inc. v. Sheffield Farms Co., supra, which upheld a complaint premised on section 2(a) violations on the ground that it showed that defendant was "engaged in a continuous stream of commerce in securing milk outside the State of New York for sale in the State of New York to plaintiff and to competitors." On the basis of the

foregoing authorities, we conclude that Foremost's shipments of milk to its Albuquerque customers had such significant interstate incidents that they constitute purchases in commerce sufficient to furnish the FTC with a jurisdictional basis for the application of section 2(a) of the Robinson-Patman Act.

## II. COMPETITIVE INJURY

Section 2(a) of the Robinson-Patman Act seeks to protect against two types of injuries which may result from the discriminatory pricing policies of an interstate seller. The probability of a general injury to competitive conditions in the market in which the seller or the purchaser sells his product will support a cease and desist order or afford an aggrieved party the basis for an action in damages. An injury of this broad nature is more prevalent in primary-line cases, as where a dominant seller uses discriminatory pricing policies to enhance its market position and therefore diminish the general vigor of competition or to increase the concentration of market power in the industry. However, the act also protects the victim of unwarranted price differentials from a more narrow type of injury by prohibiting such differentials where the result may be substantially to "injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them."

Foremost urges that the Commission's inference of this latter type of injury in

fendants purchased from out of state. The court based its decision squarely on the ground that the indictment alleged an effect on interstate commerce, although it noted that the case presented a stronger factual setting for establishing the stream of commerce doctrine than that in Standard Oil Co. v. FTC, discussed infra. See also United States v. Sheffield Farms Co. (S.D.N.Y.1942) 43 F.Supp. 1. However, the Pevely Dairy indictment contained no allegation that the flow of milk across state lines was reduced in any fashion. It only asserted that the defendant dairies had conspired to fix the wholesale and retail prices at which fluid milk was resold in Mis-

souri and that this restraint had the effect of stabilizing the milk prices in St. Louis of milk which was produced outside of Missouri. In upholding the indictment, the court necessarily held that the milk remained in interstate commerce until it reached the ultimate consumers.

8. The term "processing", as used in section 2(e), has been defined as "a mode of treatment of materials to be transformed or reduced to a different state or thing." Corn Products Refining Co. v. FTC, 324 U.S. 726, 744, 65 S.Ct. 961, 970, 89 L.Ed. 1320, 1335 (1945). We do not have that degree of product transformation in the instant case.

the instant case was not supported by substantial evidence in the record. Specifically, Foremost complains that there was no evidence of underselling by its favored customers and no evidence that the unfavored customers actually engaged in substantial competition with any of Barber's stores during the period when the discounts were in effect. Essentially, the Commission takes the position that, if it can show a substantial price differential which is sustained over a significant period of time in a business where profit margins are low and competition keen, it is proper to infer that an injury to competition with the favored purchaser is probable. Foremost argues that the Commission's approach establishes a virtual *per se* rule with respect to proof of a secondary-line injury.

The evidence in the instant proceeding is admittedly meagre. It was proved at the hearing that Foremost granted a discount to the Barber chain on its purchases of fluid milk over a period of two years, and that in the first three-quarters of this period the rebates involved more than $7600 cash advantage to Barber on total milk purchases of $153,361.16. It was also shown that Foremost did not offer comparable price advantages to its independent customers in the Albuquerque area. The evidence further indicates that Barber did not utilize the cash advantage it received from Foremost to reduce the retail price of its milk products. There is also testimony from which the Commission could infer what are well-known facts—that profit margins in the

sale of fluid milk are relatively low and that competition in the sale of milk at retail is quite lively.[9]

Furthermore, the record reveals that Conniff, who was an independent customer of Foremost, competed directly with one of Barber's stores during the last month in which the discounts were in effect. He testified that at the time the price concessions were initiated he bought Foremost milk at forty-five cents a half gallon and sold it at fifty-two cents. Later Conniff felt it necessary to reduce the resale price of his milk by three cents a half gallon because "chains were selling at fifty-two and giving double stamps on milk." It was established that double trading stamps were the approximate equivalent of a five per cent reduction in the resale price of a half gallon of milk.[10] Conniff also testified that his grocery customers came from all over Albuquerque and that if he were able to offer a three to five cent reduction on the price of a half gallon of milk, it would be sufficient to draw customers into his store and divert them from his competitors.

In FTC v. Morton Salt Co., 334 U.S. 37, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), the Supreme Court commented significantly on the quantum of proof necessary to establish a secondary-line injury in a section 2(a) case. While the price differentials in that case were part of a fixed pricing system which had been maintained over a long period, the Court asserted that a showing of substantial price differences furnished a sufficient basis for

9. The hearing examiner found as follows:
    "Milk is a staple, highly standardized food item sold by virtually all food retailers, and the grocery stores in Albuquerque which received discounts from respondent competed to some degree with stores which did not receive any discount. Profits made by Albuquerque grocers on milk are low. At least one grocer grossed 4 cents, or 8.16 percent, per half-gallon profit; the list price was 45 cents and later 43 cents and a 5 percent discount was therefore significant. Competition is keen among retailers, and margins of profit and

mark-ups are small. A lower price to some but not all competing retail stores in this city would normally be expected to hinder competition between them. At least two of the chains shown to have been favored did not resell milk below their competitors' prices, but the discounts were sufficiently large to give them a competitive advantage."

10. However, there was no testimony directly establishing that Barber's utilized the rebates it obtained from Foremost to offer double trading stamps on Foremost milk, and the Commission apparently did not rely upon such an inference.

inferring a "reasonable possibility" [11] of competitive injury. The Court said at 50, 68 S.Ct. at 830:

"The Commission here went much further in receiving evidence than the statute requires. It heard testimony from many witnesses in various parts of the country to show that they had suffered actual financial losses on account of respondent's discriminatory prices. Experts were offered to prove the tendency of injury from such prices. The evidence covers about two thousand pages, largely devoted to this single issue—injury to competition. It would greatly handicap effective enforcement of the Act to require testimony to show that which we believe to be self-evident, namely, that there is a 'reasonable possibility' that competition may be adversely affected by a practice under which manufacturers and producers sell their goods to some customers substantially cheaper than they sell like goods to the competitors of these customers." [12]

While we adhere to the proposition that price discriminations are not *per se* illegal,[13] we feel that we must defer to the Commission the task of drawing the inference of a probable injury to competitors so long as that inference is supported by a reasonable quantum of evidence in the record. Where the evidence indicates an industry in which competition in the secondary line is keen, profit margins are low, substantial price differentials have been offered, and group

or aggregate buying has been prevalent, the FTC's inference of probable competitive injury has been upheld even in the face of direct testimony by non-favored customers that the price discrimination had not resulted in an injury to their businesses. See Whitaker Cable Corp. v. FTC (7 Cir. 1956) 239 F.2d 253, cert. denied 353 U.S. 938, 77 S.Ct. 813, 1 L.Ed.2d 761 (1957); E. Edelmann & Co. v. FTC (7 Cir. 1956) 239 F.2d 152; Moog Industries, Inc. v. FTC (8 Cir. 1956) 238 F.2d 43, aff'd on other grounds, 355 U.S. 411, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958). Indeed, it seems well-established that where the record indicates a price differential substantial enough to cut into the purchaser's profit margin and discloses a reduction which would afford the favored buyer a significant aggregate saving that, if reflected in a resale price cut, would have a noticeable effect on the decisions of customers in the retail market, an inference of injury may properly be indulged.[14] It is unnecessary that there be evidence that the favored customer actually undersold his rivals; a substantial price advantage can afford a favored buyer a material capital advantage by enlarging his profit margin in a highly competitive field or it can enable him to offer customer-attracting services which will give him a substantial advantage over his competition. In the instant case, there was evidence that such services were made available by some grocery chains, although the Commission did not conclude that the offering of bonus trading stamps resulted directly from the cash rebates in question.

11. Perhaps it should be noted that in the instant case the FTC applied a standard of probable injury rather than the "reasonable possibility" standard articulated in Morton Salt. Apparently, the Commission applies a standard of probability as a matter of course, although the distinction between the two standards may be more apparent than real.

12. Recently the Court reaffirmed this approach in FTC v. Anheuser-Busch, Inc., 363 U.S. 536, 80 S.Ct. 1267, 4 L.Ed.2d 1385, 1395 n. 21 (1960).

13. Indeed, the Commission itself has required rather detailed evidence of a com-

petitive injury where unfavored customers are required to sell at preticketed prices and are engaged in different businesses from the favored buyers, see W. F. Schrafft & Sons Corp., 3 CCH Trade Reg.Rep. ¶ 16882 (May 14, 1964), or where profit margins are high, see Fred Bronner Corp., 1960–61 CCH Trade Reg. Rep. ¶ 29125 (1960).

14. See generally Edwards, The Price Discrimination Law, 518–545 (1959); Austin, Price Discrimination and Related Problems Under the Robinson-Patman Act 40–49 (rev. ed. 1953).

Foremost relies on the recent case of American Oil Co. v. FTC (7 Cir. 1963) 325 F.2d 101, cert. denied, 377 U.S. 954, 84 S.Ct. 1631, 12 L.Ed.2d 498 (1964), in which the petitioner granted short-lived price concessions to customer service stations in one area while similar concessions were not granted to customers in a neighboring area which competed to some extent with customers in the favored area. The concessions were granted for a 17-day period in the heat of a gasoline price war. Although the evidence showed an actual loss of sales by the customers located in the non-favored area, under the circumstances of the price war the court found that there was no basis for inferring a causal connection between the injury and the price discriminations. Nor was there evidence of a substantial impairment of the ability of the unfavored dealers to compete. This case is clearly distinguishable from the one under consideration, particularly in view of the duration of the discriminations in the instant case and the context in which they were made. However, the opinion certainly indicates that the courts have not adopted a *per se* approach to section 2(a) cases.

There is no merit in Foremost's contention that there is a lack of evidence that any of its unfavored customers other than Conniff competed with Barber's. It is true that most of Barber's stores are located in the eastern portion of Albuquerque, while most of Foremost's independent customers are situated in the western part of the city. With the exception of store #4, none of the Barber's stores are located in close proximity to the unfavored customers of Foremost. Barber's store #4 had only been opened for one month when the discriminatory pricing policies were discontinued by Foremost. Although there is some warrant in that situation for inferring a probability of competitive injury had the rebates continued in effect, the Commission was not so restricted. It seems evident that the FTC viewed the entire Albuquerque area as the market in which competitors suffered probable injury. In the grocery business, where competition is keen and profit margins are low, customers may often drive to relatively distant retail outlets if significant price differences or alluring bonuses are made available. This is borne out by the testimony of Conniff that his customers were not restricted to those living in the immediate neighborhood of his store.

We think the tone set by the Supreme Court in the Morton Salt case requires that we affirm the FTC's inference of a probable injury to competition in the circumstances and in light of the industry setting.[15] As we noted earlier some deference must be made to the Commission's expertise in this area as long as its conclusions are supported by substantial evidence.

## III. PROPRIETY OF THE ORDER

Foremost attacks the entry of a cease and desist order in this case on the ground that no pattern of violations was indicated by the evidence. It is contended that the Commission abused its discretion in entering an order at all, and, in the alternative, that if any order was proper it should have been directed only to the isolated violation which was found to exist. The FTC may exercise a broad discretion in determining the propriety and scope of an order in a particular case, a discretion which will only be set aside by a reviewing court "where the remedy selected has no reasonable relation to the

15. In this connection, we call attention to the following description in FTC v. Morton Salt, 334 U.S. at 49, 68 S.Ct. at 829, 92 L.Ed. at 1205:
"There are many articles in a grocery store that, considered separately, are comparatively small parts of a merchant's stock. Congress intended to protect a merchant from competitive injury attributable to discriminatory prices on any or all goods sold in interstate commerce, whether the particular goods constituted a major or minor portion of his stock. Since a grocery store consists of many comparatively small articles, there is no possible way effectively to protect a grocer from discriminatory prices except by applying the prohibitions of the Act to each individual article in the store."

682

unlawful practices found to exist." FTC v. Ruberoid Co., 343 U.S. 470, 473, 72 S. Ct. 800, 803, 96 L.Ed. 1081, 1087 (1952). We cannot say that the order under consideration was unreasonable in the circumstances. To limit the Commission to the entry of orders which are directed only to the specific violation found to exist would be not only unrealistic but also would frustrate the purposes of the Robinson-Patman Act. It should be made clear however, that the order does not deprive Foremost of its right to offer price differentials which fall within the scope of the traditional defenses in sections 2(a) and (b) of the Act.

The order is affirmed.