# United States Court of Appeals

## For the First Circuit

No. 04-1922

ABLE SALES COMPANY, INC.,
Plaintiff, Appellee,

v.

COMPAÑÍA DE AZÚCAR DE PUERTO RICO,
Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO
[Hon. Juan M. Pérez-Giménez, U.S. District Judge]

Before

Selya and Lynch, Circuit Judges.[*]

Gina Ismalia Gutiérrez-Galang, with whom Law Office Pedro E. Ortiz Álvarez was on brief, for appellant.

Carlos A. Rodríguez Vidal, with whom Myriam Fernández González, and Goldman Antonetti & Cordova, P.S.C. were on brief, for appellee.

May 6, 2005

[*]Circuit Judge Torruella participated in oral argument in this case, but has since recused himself and has not participated in the decision of the case. The remaining two panelists, pursuant to 28 U.S.C. § 46(d), issue this opinion.

**LYNCH, Circuit Judge**.  This case presents the issue of the meaning of the jurisdictional "in commerce" requirement of § 2(a) of the Robinson-Patman Anti-Discrimination Act, 15 U.S.C. § 13.

Judgment was entered under the Act for Able Sales ("Able") and against Compañía de Azúcar de Puerto Rico ("CAPR"), a corporation that is primarily engaged in the refining of raw sugar and the subsequent sale of this sugar in the local Puerto Rico market.  CAPR argues on appeal that the district court did not have subject matter jurisdiction to entertain the suit brought by Able because the "in commerce" requirement was not met.  Able is a corporation primarily engaged in the importation and distribution of refined sugar in the local Puerto Rico market and a competitor of CAPR.

Specifically, CAPR argues that its sale of refined sugar to various local wholesalers and retailers in Puerto Rico does not satisfy the "in commerce" requirement of the statute.  Able counters that any of three separate transactions -- (1) CAPR's importation of raw sugar into Puerto Rico for refinement and sale; (2) Able's importation of refined sugar from Florida; and/or (3) CAPR's sale of refined sugar to a local company which planned to export the sugar -- independently satisfy this requirement and thus provide a basis for subject matter jurisdiction in the district court.

-2-

The district court agreed and after a two day bench trial found that CAPR had violated § 2(a) of the Robinson-Patman Act and awarded $1,949,259.00 in damages to Able.

We hold that the transactions do not satisfy the "in commerce" requirement, reverse the judgment, and remand with directions that judgment be entered for CAPR.[1]

## I.

We briefly recount the facts, largely as found by the district court. CAPR does not dispute the district court's characterization of the facts.

Until December of 2000, the Puerto Rico Sugar Corporation ("PRSC"), a public corporation created by a Resolution of the Board of Governors of the Puerto Rico Land Authority in 1973, was the sole supplier of "Snow White" brand refined sugar in Puerto Rico. The Puerto Rico Department of Consumer Affairs ("DACO") established regulations which required PRSC to sell all of its two and five pound bags of refined sugar to ten exclusive distributors, one of which was Able. These distributors then sold the bags to wholesalers and retailers; DACO fixed the maximum prices for sugar that the distributors could offer.

In January 2001, the Puerto Rico Legislature moved away from governmental ownership and privatized the local sugar

---

[1]Because we set aside the judgment awarded to Able, we do not address CAPR's second argument on appeal: that the district court erred in the calculation of damages.

industry.  See 5 P.R. Laws Ann. § 430(a).  It transferred the operations and assets of the Mercedita Refinery to CAPR.  Until September 2001, CAPR sold the existing inventory of refined sugar from the refinery to the distributors, including Able, at the price of $43.23 per hundredweight, as established by DACO and as previously offered by the PRSC.

By September 2001, CAPR had sold all the Mercedita inventory and was unable to supply the local demand for refined sugar.  Due to the lack of refined sugar, Able and another distributor, in agreement with DACO, imported refined sugar required for local consumption, with the expectation that CAPR would later import raw sugar, refine it, and resume the previous distributor system.  Because the cost of the imported refined sugar was higher than the price established by DACO, DACO issued an order which allowed the importers to sell the refined sugar to other distributors and wholesalers at a higher price than had been previously permitted by regulation.  The new, higher price for distributors was $46.10 per hundredweight; distributors sold to wholesalers at the price of $48.54 per hundredweight.  This order was vacated in January of 2002, and the lower prices were reinstated.

CAPR, having sold all of its inventory of refined sugar, needed a new source of supply if it wished to continue in the business.  It chose to import raw sugar to refine.  In a one-time

purchase, CAPR imported approximately 12,000 tons of raw sugar into Puerto Rico which it refined at its Mercedita facility. There is no evidence of any further importation of raw sugar by CAPR. Able attempted to buy refined sugar from CAPR (apparently refined from this one-time importation of raw sugar) at the distributors' price ($43.23 per hundredweight), but on December 26, 2001, CAPR notified Able that it was cutting distributors from its sales strategy and would no longer be selling to distributors. Instead, CAPR would be selling directly to wholesalers and retailers: if Able wanted to buy CAPR's refined sugar, it could do so at the wholesalers' price (not the lower distributors' price). Unfortunately for Able, this price was also the maximum price that Able could, by law, sell to its clients.

Thus CAPR moved from being a supplier to Able, which was a distributor, to being a direct competitor to Able, with CAPR also acting as a distributor and selling directly to wholesalers. Both CAPR and Able sold directly to wholesalers and retailers, all of which were local Puerto Rico entities. One wholesaler, Tropical, purchased refined sugar from CAPR for export.

In an effort to make a profit and compete with CAPR, from January to February of 2002, Able imported from Florida refined sugar at a cost of $44.63 per hundredweight under the trademark "Florida Crystal." In conformance with DACO guidelines, Able

anticipated selling the sugar to wholesale clients at $47.54 per hundredweight.

Shortly thereafter, CAPR reduced the price of the sugar it had refined for sale to wholesalers from $47.54 to $45.10 per hundredweight. This was the beginning of the alleged period of predatory pricing. Able was forced to reduce its price as well to compete with CAPR.

At the end of April 2002, CAPR again reduced its price to wholesalers, this time to $43.30 per hundredweight. This lower price was not enough to cover CAPR's costs, which consisted of the costs of refining the raw sugar, the sale of the now-refined sugar, and the excise tax of $14.00 per hundredweight which CAPR was obligated to pay to the Puerto Rico Department of the Treasury. Throughout the time that CAPR was lowering its prices, it did not pay this excise tax as required by law.

Despite Able's efforts to compete with CAPR, it lost a number of its clients and its market share was reduced by between forty and fifty percent. The district court found that other distributors were eliminated from the market as a result of CAPR's pricing.[2] In September 2002, CAPR exhausted its inventories and

---

[2]CAPR does point out that Able's chairman admitted at trial that the other two and five pound bag sugar distributors ceased operations on January 1, 2002, prior to the alleged predatory pricing period from February of 2002 to September of 2002. The district court's finding, however, has no bearing on whether or not there is subject matter jurisdiction; we merely note the discrepancy.

did not purchase any additional raw sugar. There is no further evidence in the record as to whether CAPR has remained in the business of selling refined sugar to wholesalers after it had exhausted the inventory of sugar it had refined from the one-time import of the 12,000 tons of raw sugar.

Able filed the verified complaint on May 22, 2002 averring its version of the facts and alleging that CAPR engaged in "predatory pricing" in violation of the Robinson-Patman Act, 15 U.S.C. § 13. Specifically, Able stated:

> Defendant's practice consists of distributing sugar at prices lower than the costs of its inventory. The objective of said pricing structure is to eliminate Able Sales from the market, to allow CAPR to prevail upon the market as the sole sugar distributor in Puerto Rico. . . . [This] practice will then enable [CAPR] to recoup the losses sustained during its current scheme of predatory pricing.

On June 5, 2002, the summons, a copy of the verified complaint, and Able's first set of interrogatories and requests for production were served on CAPR. On August 9, 2002, after two extensions of time, CAPR filed an answer. After CAPR's continual failure to comply with discovery orders, the district court, pursuant to an Order of October 28, 2003, struck CAPR's answer to the complaint and its affirmative defenses. CAPR does not appeal this order.

On November 12 and 13, 2003, a bench trial was held before the district judge. At trial, Able presented documentary

evidence, testimony of the Chairman of the Board of Able Sales, and an expert who testified as to Able's damages. CAPR was given an opportunity to present evidence and to cross examine witnesses. CAPR declined to present evidence, but did cross examine witnesses.

Having stricken the defendant's answers and affirmative defenses from the record, the court determined that CAPR engaged in primary line price discrimination in contravention of the Robinson-Patman Act. The court stated, "this case clearly entails a primary-line price discrimination, in which CAPR imported raw sugar from sources outside of Puerto Rico, refined it at the Mercedita Refinery, and sold the refined sugar at below cost so as to eliminate its competitors."

CAPR challenged the court's subject matter jurisdiction, contending the "in commerce" requirement was not satisfied. The court found that it did have subject matter jurisdiction based on either CAPR's importation of raw sugar which it found remained in the flow of commerce or Able's importation of refined sugar.[3]

**II.**

Price discrimination is made unlawful by § 2(a) of the Clayton Act, as amended by the Robinson-Patman Act, which provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce,

---

[3]In a footnote, the district court referenced the transaction between Tropical and CAPR as a basis for subject matter jurisdiction and stated "CAPR did sell refined sugar for exportation."

-8-

> either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality . . . where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . . .

15 U.S.C. § 13(a); see Brooke Group LTD v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219-20 (1993). The statute encompasses two different types of violations: primary line violations and secondary line violations. Primary line violations are directed at injuring competition with the discriminating seller's direct competitors, whereas secondary line violations are directed at injuring competition among the discriminating seller's customers. See Coastal Fuels of P.R., Inc. v. Caribbean Petroleum Corp., 79 F.3d 182, 188 (1st Cir. 1996); IA Areeda & Hovenkamp, Antitrust Law ¶ 267c, at 329-30 (2d ed. 2000). In this case, the district court found that CAPR had committed a primary line violation by engaging in predatory pricing.[4]

---

[4]In general, primary line violations involve a claim by the injured party that "[a] business rival has priced its products in an unfair manner with an object to eliminate or retard competition and thereby gain and exercise control over prices in the relevant market." Brooke Group, 509 U.S. at 222; see also III Areeda & Hovenkamp, Antitrust Law ¶ 745e, at 477 (2d ed. 2002). We express no view as to whether the district court correctly determined that the facts alleged by Able establish a primary line violation of § 2(a) of the Robinson-Patman Act. This issue has not been raised on appeal. The only question before us is whether the "in commerce" requirement of the Robinson-Patman Act is satisfied.

Whether the district court has subject matter jurisdiction over these types of violations is largely determined by the Supreme Court's decision construing § 2(a) of the Robinson-Patman Act, 15 U.S.C. § 13(a), in <u>Gulf Oil Corporation</u> v. <u>Copp Paving Company, Inc.</u>, 419 U.S. 186 (1974). <u>Gulf Oil</u>, which involved a secondary line violation, held, as all parties agree, that § 2(a) of the Robinson-Patman Act did not extend jurisdiction to the full extent of Congress's constitutional power granted by the Commerce Clause. <u>Id.</u> at 199-200. The Court stated:

> [T]he distinct "in commerce" language . . . appears to denote only persons or activities within the flow of interstate commerce . . . . [T]he jurisdictional requirements of these provisions cannot be satisfied merely by showing that allegedly anticompetitive acquisitions and activities affect commerce.

<u>Id.</u> at 195. To satisfy the "in commerce" requirement, one of the discriminatory sales must cross a state line. See <u>Id.</u> at 195; <u>Coastal Fuels</u>, 79 F.3d at 190. As this requirement is jurisdictional, <u>see</u> <u>Gulf Oil</u>, 419 U.S. at 195, the burden to prove the interstate character of the sales is on the party asserting subject matter jurisdiction. See <u>Bull HN Info. Sys., Inc.</u> v. <u>Hutson</u>, 229 F.3d 321, 328 (1st Cir. 2000) (the party asserting jurisdiction has the burden of proving it).

In an effort to meet this burden, Able points to three transactions which it argues satisfy the "in commerce" requirement of § 2(a): (1) CAPR's importation of raw sugar into Puerto Rico

-10-

for refinement and sale; (2) Able's importation of refined sugar from Florida; and (3) CAPR's sale of refined sugar to Tropical with the knowledge that Tropical planned to export this sugar.

A. Focus on Plaintiff's Activities

We first reject Able's argument that the "in commerce" element may be satisfied by reviewing the interstate activities of the plaintiff, whether or not the defendant has acted "in commerce." Specifically, Able argues that it imports refined sugar from Florida for sale in Puerto Rico, and this transaction crosses state lines. We disagree that the plaintiff's sales can be used to satisfy the "in commerce" requirement of § 2(a) of the Robinson-Patman Act.

Following the language of the statute, the Supreme Court in Gulf Oil held[5] that in order to satisfy the "in commerce" requirement of the § 2(a) of the Robinson-Patman Act, the defendant's activities must satisfy the following test:

> Unless it appears . . . that the [defendant's] alleged exclusive-dealing arrangements and discriminatory sales occur in the course of its interstate activities . . . and . . . that at least one of [defendant's] allegedly discriminatory sales was made in interstate commerce . . . , plaintiff's claims must fail.

---

[5]We have excluded language concerning the requirements as to § 7 of the Clayton Act, as no § 7 allegations are made here.

Gulf Oil, 419 U.S. at 195.[6]  In other words, "if one of the discriminatory sales is 'in commerce,' the seller is engaged in commerce and discrimination has occurred in the course thereof." IA Areeda and Hovenkamp, Antitrust Law ¶ 267c, at 329 (2d ed. 2000).  The activities which must meet the in commerce requirements are the sales by the defendant seller.

A focus on the defendant's sales is consistent with Congressional purpose.  As the Supreme Court stated in Standard Oil Company v. FTC, 340 U.S. 231 (1951), "the recognized purpose of the Robinson-Patman Act [is] to reach the operations of large interstate businesses in competition with small local concerns." Id. at 237-38.  Congress was concerned with predatory pricing by defendants who engaged in interstate commerce, not by those who acted purely locally.  See Gulf Oil, 419 U.S. at 200-01 (reading the clear language of § 2 to exclude from the reach of the statute

_____

[6]To support the finding that Able's transactions could satisfy the "in commerce" requirement, the district court erroneously read language in Gulf Oil that states, "§ 2(a) applies where at least one of the two transactions which, when compared, generate a discrimination . . . crosses a state line." Gulf Oil, 419 U.S. at 200 (internal citation and quotation marks omitted).  Gulf Oil involved a secondary line violation which requires, among other things, the discriminating seller to sell to one buyer (the favored buyer) at a lower price than to another buyer (the disfavored buyer).  The two transactions to be compared, as this court's opinion in Coastal Fuels explained, are "either the sale to the favored buyer or the sale to the buyer allegedly discriminated against." Coastal Fuels, 79 F.3d at 189.  In either a primary line violation or a secondary line violation, it is the sales by the defendant which are the focus.

-12-

"a multitude of local activities that hitherto have been left to state and local regulation").

To impose liability on a defendant seller for activities within the sole control of a plaintiff competitor would itself be anti-competitive, and contrary to the purposes of the Robinson-Patman Act.  A defendant seller must be able to know when it is subject to Robinson-Patman Act liability in order to conform its behavior to the law.  We focus therefore only on the defendant's behavior.  We reject the argument that the sales activity of the plaintiff, Able's importation of refined sugar from Florida, can be the basis for satisfying the "in commerce" jurisdictional requirement of the statute.

B.  Defendant's Alleged Interstate Transactions

1.  CAPR's Importation of Raw Sugar Across State Lines

Able argues that even though CAPR's sales of refined sugar did not cross state lines, these sales satisfy the "in commerce" requirement because CAPR imported 12,000 tons of raw sugar,[7] and CAPR's refinement in Puerto Rico of this imported sugar did not remove the sugar from  the "flow of commerce."  This is an aspect of the doctrine concerned with the "flow backward into

_____

[7]CAPR suggests in its reply brief that the one-time importation of raw sugar cannot satisfy the "in commerce" requirement of § 2(a) because CAPR did not regularly import products from across state lines and there was not a "constant flow" of raw sugar into Puerto Rico.  We express no view on the validity of this argument.

interstate transactions in raw materials."  IA Areeda & Hovenkamp, Antitrust Law ¶ 267b, at 324 (2d ed. 2000).

Whatever the present contours of the in the "flow of commerce" doctrine under the Robinson-Patman Act, it certainly does not apply when there are material differences between the product imported and the product sold after undergoing processing.  The fact that the raw materials were imported into Puerto Rico does not necessarily mean that the "in commerce" requirement of § 2(a) of the Robinson-Patman Act is met.  See Belliston v. Texaco, Inc., 455 F.2d 175, 180 (5th Cir. 1972) (The production of gasoline from crude oil is a "highly complex process" which interrupts the flow of commerce).  Indeed the "flow of commerce" ends when these raw materials or goods are "transformed in a material way."  See IA Areeda & Hovenkamp, Antitrust Law ¶ 267b, at 324 (2d ed. 2000).

CAPR argues that the imported raw sugar was transformed in such a material way when it underwent refining into refined sugar.  CAPR states that the raw sugar was  "extensively processed within Puerto Rico, resulting in an alteration of the nature of the product" and that the refinement process "extract[s] molasses and other non-sugar minerals [from] the raw sugar."

We agree that the refinement of raw sugar into refined sugar has transformed this product so that it cannot be fairly said to continue to be in the flow of commerce.  This case is distinguishable from cases where courts have found the flow of

-14-

commerce was not interrupted. This is not a case in which the same product was temporarily stored in the state of ultimate sale. See, e.g., Standard Oil Co., 340 U.S. at 237-38 (temporary storage of gasoline does not deprive the gasoline of its interstate characteristic). Nor is it a case in which the resulting sold product was essentially the same as the imported product. See, e.g., Dean Milk Co. v. FTC, 395 F.2d 696, 715 (7th Cir. 1968); Foremost Dairies, Inc. v. FTC, 348 F.2d 674, 678 (5th Cir. 1965) (both holding that the processing of milk imported from out of state before local resale is not enough to remove the milk from the flow of commerce).

Despite stating that the refinement of sugar involves "negligible processing" and that the processes involved in this case are similar to those involved in the processing of milk as in the examples given above, the plaintiff does not seriously dispute CAPR's claim as to the nature of the refinement process.[8] Accordingly Able has not met its burden of showing that the imported raw sugar remained in the flow of commerce. This transaction does not satisfy the "in commerce" requirement.

---

[8]The district court did not make a specific finding as to whether the refinement process interrupted the flow of commerce. In response to CAPR's argument that it did, the district court stated, "even if the CAPR's refined sugar is not considered to be in the flow of commerce, Able Sales' refined sugar, which does not undergo any processing, is undeniably within the flow of commerce."

2.  CAPR's Sale to Tropical for Export

          In contrast with Able's previous argument concerned with backward interstate movement of materials, Able makes a forward flow argument as its final argument.  See IA Areeda & Hovenkamp, Antitrust Law ¶ 267b, at 324 (2d ed. 2000).  Whether CAPR's sale of sugar to Tropical, knowing that Tropical planned to export the sugar, can satisfy the "in commerce" requirement is a more complex question.

          From the 2002 sales summary, it appears that CAPR apparently made six sales of an indeterminate number of two pound bags of refined sugar and four sales of five pound bags of refined sugar to Tropical in 2002.  Two of those sales were in the $43 to $46 range per hundredweight, and the rest were in the $30 range.  A notation next to the sales to Tropical suggests that those sales received a special discount because Tropical intended to export the sugar, presumably outside of Puerto Rico.  These sales were likely discounted because CAPR does not have to pay an excise tax on such sales, as explained by Able's counsel.[9]

          We take Able's argument to be a permutation of the "flow of commerce" theory: the initial sale between CAPR and Able took

_____

[9]We do not understand Able to say it could not buy from CAPR at the same price Tropical did for sugar, whether intended for export or not.  Nor does Able say that it and Tropical compete with each other to export sugar from Puerto Rico.  We understand Able's argument to be based on an overall theory of predatory pricing, that CAPR artificially lowered its price in order to drive Able, its competitor in the distribution of sugar, out of business.

place intrastate, but the goods remained in the "flow of commerce" because they were to be exported by Tropical and CAPR's knowledge of that puts the goods into the flow of commerce.  The interstate activity of the buyer is therefore attributed back to CAPR, the intrastate seller, under the theory.

This forward flow theory may be arguable on certain facts.  Cases under statutes based on the full scope of Congress' constitutional commerce power over certain types of intrastate transactions have suggested "[s]o far as the [intrastate] sales are for shipment to other States or to foreign countries, it is idle to contend that they are not sales in interstate or foreign commerce and subject to congressional regulation."  Currin v. Wallace, 306 U.S. 1, 10 (1939) (challenging the Tobacco Inspection Act of 1935); see also United States v. Rock Royal Co-Op., 307 U.S. 533, 568-69 (1939) (challenging the Secretary's regulation of the handling of milk in the New York metropolitan area under the Agricultural Marketing Agreement Act of 1937).  But of course, the scope of the "in commerce" clause of the Robinson-Patman Act is less than the constitutional reach.

While Gulf Oil held that a mere nexus to interstate commerce was insufficient, it did not decide whether some intermediate definitions of "in commerce" to capture the "practical consequences" of a discriminatory sale on national markets might be within Congressional intent.  Gulf Oil, 419 U.S. at 199.  Indeed

the Court specifically noted the absence of two claims:  that the defendant made interstate sales or was "otherwise directly involved in national markets" or that the "local market . . . is an integral part of the interstate market in other component commodities or products."  Id. at 195-96.

But the record before us does not establish and indeed the plaintiff does not argue that either of those situations apply. Ultimately, Able fails to prove that the "flow of commerce" test is satisfied.  The only evidence that Able points to concerning the sale from CAPR to Tropical is a sales summary of the sale to Tropical which has the notation, "[s]pecial price for exportation of sugar, plus taxes," and a statement made by Able's trial counsel to the district court that "[a]mong the sales that [CAPR] was able to execute during that year, one of their clients, Tropical Distributors, was sold sugar at a special price because he was going to export sugar."

For several reasons this evidence is insufficient to prove that the sale was "in commerce."  The flow of commerce is thought to end when the goods "are stored in a [seller's] warehouse or storage facility for general inventory purposes," subject to an exception for when the goods are purchased and then stored in the seller's warehouse in response to a particular customer's needs. See Zoslaw v. MCA Distributing Corp., 693 F.2d 870, 878 (9th Cir. 1982).  That exception does not apply here.  There is no evidence

-18-

that CAPR's sale to Tropical was anything other than final, with Tropical taking possession of the sugar. Indeed, there is no evidence whether Tropical actually ever exported the sugar. But what Tropical, an independent company, intended to do with the sugar, in these circumstances, is not germane to the "in commerce" inquiry.

While there is evidence of negotiation over price and that CAPR expected that Tropical would export the sugar, there is no evidence that CAPR exercised any control of the management, business, or distribution decisions of Tropical. In cases where the "flow of commerce" doctrine applied, the same entity has engaged in both the intrastate and interstate transaction. See, e.g., Standard Oil, 340 U.S. at 237 (intrastate sale was in the flow of commerce; both the intrastate and interstate transactions were conducted by the same entity); Foremost Dairies, 348 F.2d at 676-77 (same). And courts have held that to the extent that the purchasers are independent distributors in their pricing and marketing decisions, the "flow of commerce" is interrupted by the sale of the product. See Zoslaw, 693 F.2d at 880; cf., Acme Refrigeration of Baton Rouge, Inc. v. Whirlpool Corp., 785 F.2d 1240, 1243-44 (5th Cir. 1986) (a subsidiary's sales could not be imputed to its parent company if the parent company did not "control" the subsidiary).

In a situation where a wholly independent buyer purchases from the defendant seller, and there is no evidence of collusion or control between the seller and the independent buyer,[10] the flow of commerce has ended and the intrastate seller cannot be held to have been made "in commerce" as a result of the subsequent interstate sale made by the independent buyer.

## III.

We hold that the district court did not have subject matter jurisdiction over this suit as CAPR's allegedly discriminatory sales were not "in commerce." We **reverse** the decision of the district court, set aside the award of damages against CAPR, and remand with instructions to dismiss the case for lack of jurisdiction. Costs are awarded to CAPR.

---

[10]Areeda also warns against reliance on a party's intentions, as opposed to actions, except to cover the situations of "evasions calculated to keep illegal activities entirely intrastate while employing the channels of interstate commerce." IA Areeda & Hovenkamp, <u>Antitrust Law</u> ¶ 267 b, at 324-327 (2d ed. 2000).