TORRUELLA, Circuit Judge
(dissenting).[16]
In its haste to “put [plaintiffs-appellants’] constitutional claim fully at rest,”[17] maj. op. at 148, the majority has chosen to overlook the issues actually before this en banc court as framed by the order of the rehearing panel, see Igartúa-De L Rosa v. United States, 404 F.3d 1 (1st Cir.2005) (order granting panel rehearing), which panel the en banc court suppressed, but whose order was adopted as establishing the parameters of the issues to be decided by the en banc court. See Igartúa de la Rosa v. United States, 407 F.3d 30, 31 (1st Cir.2005) (converting to en banc review panel rehearing in which “the parties [are] to address two issues: first, the plaintiffs’ claim that the United States was in default *159 of its treaty obligations and, second, the availability of declaratory judgment concerning the government’s compliance with any such obligations.”). It is these issues that the parties were asked to brief; Instead the majority has sidetracked this appeal into a dead end that is no longer before us: Puerto Rico’s lack of electoral college representation, see U.S. Const, art. II, § 1, cl. 2, and our lack of authority to order any constitutional change to such status by reason of that constitutional 'impediment.
In doing so, the majority fails to give any weight to the fundamental nature of the right to vote, and the legal consequences of this cardinal principal. Under the combined guise of alleged political question doctrine, its admitted desire to avoid “embarrassment” to the United States, and its pious lecturing on what it deems to be the nature of the judicial function, the majority seeks to avoid what I believe is its paramount duty over and above these stated goals: to do justice to the civil rights of the four million United States citizens who reside in Puerto Rico. The majority labels this duty with despect as “rhetoric” and “intuitive values.” Maj. op. at 147. I beg to differ, and so, I suspect, do a considerable number of those four million U.S. citizens who, lacking any political recourse, look to the courts of the United States for succor because they are without any other avenue of relief. See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (“[Pjrejudice against discrete and insular minorities may be a special condition, which tends seriously to curtail the operation of those political processes ordinarily to be relied upon to protect minorities and ... may call for correspondingly more searching judicial inquiry.”).[18]
Considering that justice and equity are the handmaidens of the law, I believe it is the duty of this court to exercise its equitable power under the Declaratory Judgment Act, 28 U.S.C. § 2201(a),[19] in its decision of the issues that are properly before the en banc court, and to declare that the United States has failed to take any steps to meet obligations that are cognizable as the supreme law of the land[20] regarding plaintiffs-appellants’ voting rights. “This is of the very essence of judicial duty.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 178, 2 L.Ed. 60 (1803).
Because I believe that the majority fails to meet this duty, I respectfully dissent.
I.
A. How did we come to this state of affairs?
On July 25, 1898, in the closing days of the Spanish-American War, the United *160 States invaded[21] Puerto Rico. At that point in time the inhabitants of Puerto Rico had full rights as Spanish citizens. This included the right to elect sixteen deputies and three senators, with full voting rights, to the Spanish Cortes (Parliament).[22] Fernando Bayrón Toro, Elecciones y partidos de Puerto Rico 108 (2003). Furthermore, Puerto Ricans had recently been granted a high measure of self-government. See generally Autonomic Charter of 1897, reproduced at, Documents on the Constitutional Relationship of Puerto Rico and the United States 22-46 (Marcos Ramirez Lavandero, ed., 1948).
All this came to naught with the signing of the Treaty of Paris on December 10, 1898, which officially concluded this “splendid little war”[23] and ended four hundred *161 years of Spanish colonial rule. See Treaty of Peace between the United States of America and the Kingdom of Spain, Dec. 10, 1898, U.S.-Spain, 30 Stat. 1754. Thus commenced, in its place, a new period of colonialism which has so far lasted one hundred and seven years.[24] Notwithstanding Puerto Ricans’ loss of these major political grants from Spain, the transition to United States sovereignty was largely seamless.[25] This was at least partially due to the fact that Spanish rule had been less than kind,[26] but more importantly, because of the prospect of joining a democratic nation that promised the Puerto Rican people that it had come to “bestow upon [Puerto Ricans] the immunities and blessings of [the] liberal institutions of our government.” Letter of Nelson Miles, Major-General Commanding the U.S. Army to the Inhabitants of Porto Rico (Nov. 5, 1898) in Annual Reports of the War Department for the Fiscal Year Ended June SO, 1900 19-20 (1902). See generally Bailey W. Diffie & Justine Whitfield Diffie, Porto Rico: A Broken Pledge (1931).
In fact, the Treaty of Paris left to future action by Congress what should be “[t]he civil rights and political status of the native inhabitants of the territories ... ceded to the United States”. Treaty of Peace, art. IX, para. 2, 30 Stat. 1754, 1759. Thus, for the first time in American history, the United States acquired territory without ipso facto granting its inhabitants citizenship,[27] and therefore, also contrary to its founding history, the United States became a colonial nation. See Julius William Pratt, America’s Colonial Experiment 68 (1950). Immediately after the invasion, Puerto Rico settled into a military government that lasted until 1900, when Congress enacted the so-called Foraker Act. Foraker Act, ch. 191, 31 Stat. 77 (1900) (codified as amended in scattered sections of 48 U.S.C.). This statute established a civil government composed almost totally of officials appointed by the President. A local legislature was provided, but only its lower house was elected by Puerto Rican residents. The Foraker Act declared these residents to be “citizens of Porto Rico.”[28] Foraker Act § 7 (“[A]ll inhabit *162 ants continuing to reside [in Puerto Rico] who were Spanish subjects on the eleventh day of April, eighteen hundred and ninety-nine, and then resided in Porto Rico, and their children born subsequent thereto, shall be deemed and held to be citizens of Porto Rico, and as such entitled to the protection of the United StatesAs such, they became “nationals” of the United States.[29] Almost immediately after the Foraker Act went into effect, a challenge was made to its provisions allowing the imposition of duties on goods imported into Puerto Rico from the United States. It was claimed that this tax was contrary to the Uniformity Clause of Article I, Section 8 of the Constitution. U.S. Const., art. I, § 8, cl. 1 (“all Duties, Imposts, and Excises shall be uniform throughout the United States”).
In the course of ruling upon this issue, the Supreme Court, in 1901, decided the Insular Cases,[30] wherein it sanctioned Puerto Rico’s colonial status ad perpe-tuam. There is no question that the Insular Cases are on par with the Court’s infamous decision in Plessy v. Ferguson in licencing the downgrading of the rights of discrete minorities within the political hegemony of the United States. See Plessy v. Ferguson, 163 U.S. 537, 16 S.Ct. 1138, 41 L.Ed. 256 (1896) (holding that it was not a violation of the Equal Protection Clause for a state law to segregate white and colored people in public facilities provided “equal” alternatives were provided for each race); see also Rubin Francis Weston, Racism in U.S. Imperialism: The Influence of Racial Assumptions on American Foreign Policy, 1893-1916 15 (1972) (“Those who advocated overseas expansion faced this dilemma: What kind of relationship would the new peoples have to the body politic? Was it to be the relationship of the Reconstruction period, an attempt at political equality for dissimilar races, or was it to be the Southern ‘counterrevolutionary’ point of view which denied the basic American constitutional rights to people of color? The actions of the federal government during the imperial period and the relation of the Negro to a status of second-class citizenship indicated that the Southern point of view would prevail. The racism which caused the relegation of the Negro to a status of inferi *163 ority was to be applied to the overseas possessions of the United States”)
The Insular Cases, would today be labeled blatant “judicial activism.”[31] See, e.g., Keenan D. Kmiec, The Origin and Current Meanings of “Judicial Activism”, Comment, 92 Cal. L.Rev. 1441, 1463-76 (2004) (describing judicial practices purported to be indicative of judicial activism). They are anchored on theories of dubious legal or historical validity, contrived by academics interested in promoting an expansionist agenda.[32] These theories in turn provided a platform that allowed a receptive bare plurality of Justices[33] to reach a result unprecedented in American jurisprudence and unsupported by the text of the Constitution. See generally James E. Kerr, The Insular Cases: The Role of the Judiciary in American Expansionism (1982).
In fact, what precedent existed was contrary to the premise underlying the Insular Cases, for in Dred Scott, Chief Justice Taney had concluded:
There is certainly no power given by the Constitution to the Federal Government to establish or maintain colonies bordering on the United States or at a distance, to be ruled and governed at its own pleasure.... [N]o power is given to acquire a Territory to be held and governed permanently in that character.
Dred Scott v. Sanford, 60 U.S. (19 How.) at 446.
This conclusion, however, presented no obstacle to Justice Brown, who wrote the opinion of the Court in Downes v. Bidwell, the leading Insular Cases:
We are also of opinion that the power to acquire territories by treaty implies, not only the power to govern such territory, but to prescribe upon what terms the United States will receive its inhabitants, and what their status shall be in what Chief Justice Marshall termed the “American Empire.”
Downes, 182 U.S. at 279, 21 S.Ct. 770.
Justice Brown goes on to say, in language that is tinged by Plessy-like views:
*164 It is obvious that in the annexation of outlying and distant possessions grave questions will arise from differences of race, habits, laws and customs of the people ... which may require action on the part of Congress that would be quite unnecessary in the annexation of contiguous territory inhabited only by people of the same race, or by scattered bodies of native Indians.
Id. at 282, 21 S.Ct. 770. He concluded that:
A false step at this time might be fatal to what Chief Justice Marshall called the American Empire.... If those possessions are inhabited by alien races, differing from us in religion, customs, laws, methods of taxation, and modes of thought, the administration of government and justice, according to Anglo-Saxon principles, may for a time be impossible; and the question at once arises whether large concessions ought not to be made for a time, that ultimately our own theories may be carried out.... We decline to hold that there is anything in the Constitution to forbid such action. We are therefore of the opinion that the Island of Porto Rico is a territory appurtenant and belonging to the United States, but not a part of the United States within the revenue clauses of the Constitution....
Id. at 286-87, 21 S.Ct. 770.
Justice White’s concurrence in Downes provided the central support for the seminal “unincorporated territory” doctrine for which the Insular Cases have become known. This doctrine states.that in the case of unincorporated territories — that is, those for which, at the time of acquisition, the United States did not express an intention of incorporating into the Union — only those parts of the Constitution dealing with “fundamental” rights apply. See Coudert, supra, note 32, at 832 (relating a conversation with Justice White in which it was “evident that he was much preoccupied by the danger of racial and social questions of a very perplexing character and that he was quite as desirous as Justice Brown that Congress should have a very free hand in dealing with the new subject populations”).
Chief Justice Fuller’s dissent, which was joined by Justices Harlan, Brewer and Peckham, and thus gathered the most votes, followed a strict construction of the Constitution. It rejected the plurality’s conclusion as inconsistent with the Constitution, because it
assumes that the Constitution created a government empowered to acquire countries throughout the world, to be governed by different rules than those obtaining in the original states and territories, and substitutes for the present system of republican government a system of domination over distant provinces in the exercise of unrestricted power.
Downes, 182 U.S. at 373, 21 S.Ct. 770 (Fuller, C.J., dissenting).
Justice Harlan’s dissent was equally forceful in pointing out that:
Still less is it true that Congress can deal with new territories just as other nations have done or may do with their new territories.... Monarchical and despotic governments, unrestrained by written constitutions, may do with newly acquired territories what this government may not do consistently with our fundamental law. To say otherwise is to concede that Congress may, by action taken outside of the Constitution, en-graft upon our republican institutions a colonial system such as exists under monarchical governments. Surely such a result was never contemplated by the fathers of the Constitution.... The idea that this country may acquire territories *165 anywhere upon the earth, by conquest or treaty, and hold them as mere colonies or provinces, — the people inhabiting them to enjoy only such rights as Congress chooses to accord to them, — is wholly inconsistent with the spirit and genius, as well as with the words, of the Constitution.
Id. at 380, 21 S.Ct. 770. Justice Harlan went on to say, in part to answer the racial overtones of the plurality, that:
Whether a particular race will or will not assimilate with our people, and whether they can or cannot with safety to our institutions be brought within the operation of the Constitution, is a matter to be thought of when it is proposed to acquire their territory by treaty. A mistake in the acquisition of territory, although such acquisition seemed at the time to be necessary, cannot be made the ground for violating the Constitution or refusing to give full effect to its provisions. The Constitution is not to be obeyed or disobeyed as the circumstances of a particular crisis in our history may suggest the one or the other course to be pursued.... The Constitution is supreme over every foot of territory, wherever situated, under the jurisdiction of the United States, and its full operation cannot be stayed by any branch of the government in order to meet what some may suppose to be extraordinary emergencies. If the Constitution is in force in any territory, it is in force there for every purpose embraced by the objects for which the government was ordained.
Id. at 384-85, 21 S.Ct. 770.
Although decided by an exiguous plurality of five votes to four, and based on dubious constitutional foundations, the Insular Cases became an article of faith in American constitutional dogma, with far-reaching consequences on the lives of the millions of persons whom they impacted in very fundamental ways. See Torruella, supra note 30, at 117-266.
B. United States citizenship for the residents of Puerto Rico
In the aftermath of the Insular Cases, the United States settled into the business of governing its far-flung colonial empire and emerged from its isolationist cocoon into the world of power politics. See generally Foster Dulles, America’s Rise to World Power, 1898-195U (1955). In the meantime, between 1901 and 1917, a total of twenty one bills were presented in Congress proposing the grant of U.S. citizenship to Puerto Rico’s inhabitants.[34] During this interregnum between the Insular Cases and the 1917 passage of the Jones Act, ch. 145, 39 Stat. 951 (1917) — which granted U.S. citizenship to the residents of Puerto Rico, id. § 5 — the Supreme Court decided Rassmussen v. United States, 197 U.S. 516, 25 S.Ct. 514, 49 L.Ed. 862 (1905). Rassmussen provides an important backdrop to the grant of citizenship to Puerto Ricans because in it, the Supreme Court seemed to link the incorporation of a territory into the United States (and thus full application of the Constitution) to the granting of citizenship to the inhabitants of a territory. See id. at 522 (finding grant of citizenship to residents of newly acquired territory of Alaska served “to express the purpose to incorporate acquired territory into the United States.”).
There was therefore great expectation in Puerto Rico when Congress passed the Jones Act in 1917, which, in addition to providing Puerto Ricans with an elected bicameral legislature, granted U.S. citizen *166 ship to the residents of Puerto Rico.[35] These hopes were soon deflated by the Supreme Court in Balzac v. Porto Rico, 258 U.S. 298, 42 S.Ct. 343, 66 L.Ed. 627 (1922), in which Chief Justice William Howard Taft,[36] at this point writing for a unanimous court, held that no right to trial by jury attached to Balzac’s new status as a U.S. citizen because, even after the Jones Act, Puerto Rico remained an unincorporated territory with only “fundamental rights” under the Constitution applying. The right to trial by jury was not, the Court reaffirmed, “a fundamental right.” Id. at 309-10, 42 S.Ct. 343 (quoting Dorr v. United States, 195 U.S. 138, 148, 24 S.Ct. 808, 49 L.Ed. 128 (1904)). Contra Duncan v. Louisiana, 391 U.S. 145, 154, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968) (holding that trial by jury is a fundamental right).
What rights did U.S. citizenship give Puerto Ricans? “It enabled them to move into the continental United States,” and upon becoming residents thereof, to enjoy the rights of other citizens. Balzac, 258 U.S. at 308, 42 S.Ct. 343. It was locality that counted, said Chief Justice Taft, “not the status of the people who live in it.” Id. at 309, 42 S.Ct. 343. In language reminiscent of the racially-tinged asseverations of Justice Brown in Downes, Chief Justice Taft went on to say:
The jury system postulates a conscious duty of participation in the machinery of justice which it is hard for people not brought up in fundamentally popular government at once to acquire.... Congress has thought that a people like the Filipinos, or the Porto Ricans, trained to a complete judicial system which knows no juries, living in compact and ancient communities, with definitely formed customs and political conceptions, should be permitted themselves to determine how far they wish to adopt this institution of Anglo-Saxon origin, and when.
Id., at 310, 42 S.Ct. 343.
Rassmussen was distinguished:
It is true that in the absence of other and countervailing evidence, a law of Congress ... declaring an intention to confer political and civil rights on the inhabitants of the new lands as American citizens, may be properly interpreted to mean an incorporation of it into *167 the Union, as in the case of Louisiana and Alaska. This was one of the chief grounds [for the holding in Rassmus-seri\.... But Alaska was a very different case from that of Porto Rico. It was an enormous territory, very sparsely settled, and offering opportunity for immigration and settlement by American citizens. It was on the American continent and within easy reach of the then United States. It involved none of the difficulties which incorporation of the Philippines and Porto Rico presents....
Id. at 309, 42 S.Ct. 343 (internal citation omitted).
This is a prime example of the double standard that has been used by the Court, and concomitantly by Congress, in determining the rights to which the U.S. citizens of Puerto Rico are entitled. Unfortunately, it is one which has been repeated since Balzac was decided. See Califano v. Gautier Torres, 435 U.S. 1, 98 S.Ct. 906, 55 L.Ed.2d 65 (1978) (upholding Social Security Act provisions denying benefits to U.S. citizens who move to Puerto Rico); Harris v. Rosario, 446 U.S. 651, 100 S.Ct. 1929, 64 L.Ed.2d 587 (1980) (upholding statute providing less federal financial assistance to Puerto Rico than other states to aid families with dependent children).
The Court’s rulings in Kinsella v. Krueger, 351 U.S. 470, 76 S.Ct. 886, 100 L.Ed. 1342 (1956), reh’d granted 352 U.S. 901, 77 S.Ct. 124, 1 L.Ed.2d 92 (1956), and Reid v. Covert, 351 U.S. 487, 76 S.Ct. 880, 100 L.Ed. 1352 (1956), reh’d granted, 352 U.S. 901, 77 S.Ct. 123, 1 L.Ed.2d 92 (1956), illustrate this point even more clearly. Although, in denying Puerto Ricans the right to trial by jury in Balzac, Chief Justice Taft unequivocally stated that “[i]t is locality that is determinative of the application of the Constitution in such matters as judicial procedure, and not the status of the people who live in it,” 258 U.S. at 309, 42 S.Ct. 343, the Supreme Court nevertheless chose to overlook this rule when deciding Kinsella and Reid in the aftermath of the Second World War.
Both cases involved challenges to the application of the Uniform Code of Military Justice to women who were tried, convicted and sentenced by court martial for murdering their serviceman husbands, one in Japan (Kinsella), and the other in England (Reid). Neither had the benefit of indictment by grand jury or trial before a petit jury. On the first round, the Court, relying on Balzac, affirmed the validity of both convictions. Kinsella, 351 U.S. at 474-80, 76 S.Ct. 886; Reid, 351 U.S. at 490-91, 76 S.Ct. 880 (relying on Kinsella as establishing validity of military jurisdiction).
This outcome was followed by much public stirring, an unsurprising result, considering the number of civilian U.S. citizens who were then attached to the military overseas. The public outcry undoubtedly contributed to their being reheard almost immediately, early in the Court’s next term.
The plurality opinion, reversing the pri- or outcome, was written by Justice Black. He announced that the reliance placed on the Insular Cases in the first Kinsella opinion was “misplaced.” Reid v. Covert, 354 U.S. 1, 13, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957). In language reminiscent of Justice Harlan’s dissents in the Insular Cases, Justice Black stated:
The ‘Insular Cases’ can be distinguished from the present cases in that they involved the power of Congress to provide rules and regulations to govern temporarily territories with wholly dissimilar traditions and institutions whereas here the basis for governmental power is American citizenship.... The concept that the Bill of Rights and other constitutional protections against arbitrary *168 government are inoperative when they become inconvenient or when expediency dictates otherwise is a very dangerous doctrine and if allowed to flourish would destroy the benefit of a written Constitution and undermine the basis of our government.
Id. at 14, 21 S.Ct. 743 (emphasis added).
The new outcome in Kinsella and Reid, as well as the reversal of Plessy by Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), accentuate the realpolitik of the civil and political rights of the United States citizens who reside in Puerto Rico, for it is because of the democratic deficit in the Puerto Rico-United States relationship that Puerto Rico enters its second century of its colonial condition with the United States without any resolution of this conundrum in sight.[37] Stagnation is inevitable, for there is a political vacuum in the Puerto Rico-United States linkage. No effective political pressure can be exercised by the subjects of this colonial relationship on the national political institutions with power to solve the problem. It is precisely because this discrete population of United States citizens is kept in a voteless state by the national political institutions that have “plenary powers” over Puerto Rico that a “political solution” is not a realistic option. The opinion of U.S. voters affected by Kinsella and Reid could be heard and felt in Washington, as could that of African-Americans after Plessy, even if they were a numerical minority, because they had a significant political presence that was bound to be listened to sooner or later. There can be little doubt that this political clout was transformed into a judicial result. Cf. supra note 31. Not so with Puerto Rico’s U.S. citizens. They have no effective way of influencing the political branches of the national government. Puerto Rico’s lone non-voting representative in Congress is a prime example of Puerto Rico’s political defenselessness. The political pressure that can be exercised by those who took Chief Justice Taft’s advice, and moved to the Mainland, is so diluted in the general population of the United States as to make any political pressure by them exiguous.
This total lack of political power is a fact that is glossed over by the majority when it righteously dictates that Puerto Ricans’ “right to vote in presidential elections is fundamentally a political [issue] and must be [achieved] through political means.” Maj. op. at 151. To what “political means” is the majority referring? Political means are precisely what the U.S. citizens of Puerto Rico lack, and cannot create out of thin air as if by alchemy.
Not only do the national political branches lack incentive to act, but, as illustrated by the majority’s views,[38] this disin *169 centive has also been manifested in the Third Branch, which, if the truth be told, laid the groundwork for this state of affairs with its decisions in the Insular Cases and Balzac, and continues to perpetuate the inherent inequalities thus created.
The Supreme Court therefore has every reason to reconsider the Insular Cases and Balzac. They are the product of an era which is a blot on our national and judicial history. The basis upon which they were premised — that the United States could hold territories and their inhabitants in a colonial status ad infini-tum — was unprecedented and unauthorized by the Constitution. The interpretation given by the Insular Cases and Balzac to the Constitution permits the perpetuation, without limitation, of a class of citizens unequal in rights to the rest of the body politic, an anachronism that is unsupportable morally, logically or legally.
Furthermore, the underpinnings to this doctrine have since been eroded. If there ever were a justification for their outcome based on the expediency of the historical epoch during which they were decided, this justification can no longer be sustained. Since the Insular Cases and Balzac were decided, Plessy has been reversed by Brown, making racial discrimination legally and ethically unacceptable. Discrimination on the basis of locality makes as much sense as such opprobrious conduct based on race. Moreover, the idea, expressed in Balzac, that the right to trial by jury is not a fundamental constitutional right is no longer the law of the land. See Duncan, 391 U.S. at 154, 88 S.Ct. 1444. Balzac’s ruling has therefore ceased to be the law of the land.
Puerto Rico is part of the First Circuit. An Article III District Court sits there, providing nearly one-third of the appeals filed before this court, which sits in Puerto Rico at least twice a year, also in the exercise of Article III power. One active judge of this court resides in Puerto Rico and participates in cases that are often of national importance, but is nonetheless disenfranchised from voting for national offices. How can the Constitution be applied in such a Balkanized, arbitrary and irrational manner? See Downes, 182 U.S. at 374, 21 S.Ct. 770 (Fuller, C.J., dissenting) (“[T]he language of the Constitution is too plain and unambiguous to permit its meaning to be thus influenced.”).
The proposition that Puerto Rico “belong[s] to ... but [is] not a part of the United States,” Downes, 182 U.S. at 287, 21 S.Ct. 770, like the “separate but equal” concept endorsed in Plessy, belongs to the Dark Ages of American constitutional law and should be relegated to a period in our history best forgotten.
II.
A. The right to vote is a fundamental constitutional right
The right to vote is a fundamental right, which our Constitution guarantees to all citizens. See, e.g., Bush v. Gore, 531 U.S. 98, 104, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000); Burson v. Freeman, 504 U.S. 191, 198, 112 S.Ct. 1846, 119 L.Ed.2d 5 (1992); Tashjian v. Republican Party, 479 U.S. 208, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); Buckley v. Valeo, 424 U.S. 1, 49 n. 55, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976); Lubin v. *170 Panish, 415 U.S. 709, 721, 94 S.Ct. 1315, 39 L.Ed.2d 702 (1974); Bullock v. Carter, 405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972); Phoenix v. Kolodziejski, 399 U.S. 204, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970); Harper v. Virginia State Bd. of Elections, 383 U.S. 663, 667, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966); Reynolds v. Sims, 377 U.S. 533, 561-562, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964); Wesberry v. Sanders, 376 U.S. 1, 7, 84 S.Ct. 526, 11 L.Ed.2d 481 (1964).
No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic, are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right.
Wesberry, 376 U.S. at 17-18, 84 S.Ct. 526. “[H]istory has seen a continuing expansion of the scope.of the right of suffrage in this country. The right to .vote freely for the candidate of one’s choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government.” Reynolds v. Sims, 377 U.S. 533, 555, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964) (footnote omitted).
Fundamental voting rights protections should apply fully to U.S. citizens residing in Puerto Rico. Even under the notorious Insular Cases, it has been held that the Constitution extends fundamental rights to Puerto Rico. See Balzac, 258 U.S. at 312-13, 42 S.Ct. 343. The Fifth Amendment is fully applicable to the actions of the U.S. government in Puerto Rico. Cf. Examining Bd. of Engineers v. Flores de Otero, 426 U.S. 572, 96 S.Ct. 2264, 49 L.Ed.2d 65 (1976). Although not identical to that of the Fourteenth Amendment, an equal protection component is part of the due process clause of the Fifth Amendment, and serves to constrain the United States. See Bolling v. Sharpe, 347 U.S. 497, 498-99, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (holding that despite lack of explicit equal protection clause, “discrimination may be so unjustifiable as to be violative of due process”). The utter failure of the government of the United States to take any action to protect its citizens in Puerto Rico from continued national disenfranchisement is a violation of due process and equal protection under the Fifth Amendment of the Constitution.
B. International law
In addition to the right to vote enshrined in its Constitution, the United States is also bound, both domestically and internationally, by guarantees of voting rights found in international law. Historically referred to as “the law of nations,” international law incorporates both treaty law and customary international law. Restatement (Third) of Foreign Relations Law of the United States § 102 (2004) (“Restatement”). Thus conceived, international law has been an integral part of our constitutional and legal system since the founding of our Nation. See Sosa v. Alvarez-Machain, 542 U.S. 692, 124 S.Ct. 2739, 2764, 159 L.Ed.2d 718 (2004) (“For two centuries we have affirmed that the domestic law of the United States recognizes the law of nations.”); The Paquete Habana, 175 U.S. 677, 700, 20 S.Ct. 290, 44 L.Ed. 320 (1900) (“International law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction, as often as questions of right depending upon it are duly presented for their determination.”); The Nereide, 13 U.S. (9 Cranch) 388, 423, 3 L.Ed. 769 (1815) (“[T]he Court is bound by the law of nations which is part of the law of the land.”). The importance placed on international law, from the founding of the United States, as a component of the nation’s legal system is evident in its Con *171 stitution, which authorized Congress “[t]o define and punish Piracies and Felonies committed on the high Seas, and Offenses against the Law of Nations,” U.S. Const, art. I, § 8, cl. 10, granted the President the power, “by and with the Advice and Consent of the Senate, to make Treaties,” id. art. II, § 2, cl. 2, and extended the Article III authority of the federal judiciary to “all Cases, in Law and Equity, arising under this Constitution, the Laws of the United States,[39] and Treaties made, or which shall be made,” id. art. Ill, § 2, cl. 1. It also provided that “[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every state shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.” Id. art. VI, cl. 2. In light of the historical significance of international law, the Supreme Court has recently recognized that “[i]t would take some explaining to say now that federal courts must avert their gaze entirely from any international norm intended to protect individuals.” Sosa, 124 S.Ct. at 2764-65.
We look to the treaties and conventions to which the United States is a party, both to determine whether they impose a direct obligation on the United States that is relevant to plaintiffs-appellants’ claims, and, in combination with widely-observed legal norms and practices among the nations of the world today, as evidence of binding customary international law that would support plaintiffs-appellants’ claims. See Restatement § 102 (identifying sources of customary international law); see also id. § 103 (identifying secondary evidence of international law).
The United States has participated in several international instruments relevant to the issue before us: (1) the Universal Declaration of Human Rights (“UDHR”) G.A. Res. 217 A(III), U.N. Doc. A/810 (1948); (2) the American Declaration of the Rights and Duties of Man (“American Declaration”), O.A.S. Res. XXX (1948), O.A.S. Off. Rec. OEA/Ser. L/V/I.4 Rev. (1965)(3) the Inter-American Democratic Charter of the Organization of American States (“IADC”), 28th Spec. Sess., OAS Doc. OEA/Ser. P/AG/RES.l (XXVIII-E/01) (OAS General Assembly) (Sept. 11, 2001), and (4) the International Covenant on Civil and Political Rights (“ICCPR”), opened for signature Dec 16, 1966, 999 U.N.T.S. 171.[40]
In 1948, the member states of the General Assembly of the United Nations, including the United States, proclaimed the UDHR, which states:
1. Everyone has the right to take part in the government of his country, directly or through freely chosen representatives.
... [and that]
3. The will of the people shall be ... expressed in periodic and genuine elec *172 tions which shall be by universal and equal suffrage....
UDHR art. 21.
Although the Supreme Court has ruled that “the [UDHR] does not of its own force impose obligations as a matter of international law,” Sosa, 124 S.Ct. at 2767, it has nevertheless recognized its “moral authority,” id., and has cited to its provisions on several occasions. See Knight v. Florida, 528 U.S. 990, 996, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999) (Breyer, J., dissenting) (noting U.N. Human Rights Committee decisions that a ten-year delay between death sentence and execution is not necessarily a violation of UDHR as informative precedent in Eighth Amendment case); Dandridge v. Williams, 397 U.S. 471, 520 n. 14, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (citing UDHR Article 25 as informative “[o]n the issue of whether there is a ‘right’ to welfare assistance”); Zemel v. Rusk, 381 U.S. 1, 14 n. 13, 85 S.Ct. 1271, 14 L.Ed.2d 179 (1965) (citing UDHR Article 13 in discussion of scope of due process); Kennedy v. Mendoza-Martinez, 372 U.S. 144, 161 n. 16, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (noting, in rejecting revocation of U.S. citizenship as consequence of remaining abroad to evade military service, the UDHR’s guarantee “of the right of every citizen to retain a nationality”); Am. Fed’n of Labor v. Am. Sash & Door Co., 335 U.S. 538, 549 n. 5, 69 S.Ct. 258, 93 L.Ed. 222 (1949) (Frankfurter, J., concurring) (citing UDHR provisions on freedom from mandatory association in context of discussing foreign standards of labor law).
Beyond the UDHR, Article XX of the American Declaration, agreed to in 1948 by all of the member States of thé Organization of American States, including the United States, provides that: “[e]very person having legal capacity is entitled to participate in the government of his country, directly or through his representatives, and to take part in popular elections .... ”
In 2001, the United States joined thirty-four other countries in this hemisphere in adopting the IADC. Coincidentally, this occurred at a Special General Assembly of the Organization of the American States meeting in Lima, Peru on the fateful day of September 11, 2001. The importance of this agreement to the United States can be gauged by what took place there and by the actions of Secretary of State Collin Powell, who headed the U.S. delegation at that meeting. After thanking the gathered delegates for their expressions of solidarity and condolences for the terrorist attacks that had occurred that day against the United States homeland, the Secretary stated:
It is important that I remain here for a bit longer in order to be part of the consensus of this new charter on democracy. That is the most important thing that I can do before departing to go back to Washington, D.C. and attend the important business that awaits me and my other colleagues.... I hope we can move the order of business to the adoption of the Charter because I very much want to express the United States’ commitment to democracy in this hemisphere. ... And we unite behind it as democratic nations committed to individual liberties....
Secretary Colin Powell, Statement at the Special General Assembly of the Organization of American States (Sep. 11, 2001), available at http://www.state.gov/secre-tary/rm/2001/5656.htm. Thereafter, the Special Assembly adopted the IADC, which among other relevant provisions states:
Article 2
The effective exercise of representative democracy is the basis for the rule of *173 law and constitutional regimes of the member states
Article 3
Essential elements of representative democracy include, inter alia ... the holding of periodic, and fair elections based on secret balloting and universal suffrage as an expression of the sovereignty of the people
Article 6
It is the right and responsibility of all citizens to participate in decisions relating to their own development. This is also a necessary condition for the full and effective exercise of democracy....
Prior to the approval of the IADC, however, the United States had already entered into another international agreement whose provisions are of singular importance to the issue before us. By virtue of the ICCPR, which came into force on March 23, 1976, and was ratified by the Senate on April 12, 1992, see 138 Cong. Rec. S4781, S4783, the United States committed, in clear and unambiguous terms, that “[ejvery citizen shall have the right and the opportunity ... [t]o vote ... at genuine periodic elections which shall be by universal and equal suffrage.... ” ICCPR art. 25. Furthermore, in ratifying Article 2, Paragraph 1, the United States agreed that it would “undertake! ] to respect and to ensure to all individuals within its territory and subject to its jurisdiction the rights recognized in the present Covenant ... without distinction of any kind.... ” Most important, and central to the issue before us, the signatory nations committed themselves that:
[Wjhere not already provided for by existing legislation] ... each State Party ... undertakes to take necessary steps, in accordance with its constitutional processes and with the provisions of the present Covenant, to adopt such legislation or other measures as may be necessary to give effect to the rights recognized in the present Covenant.
Id. art. 2, para. 2 (emphasis added).[41]
We turn now to an examination of the United States’ obligations under these international instruments and the customary international law to which they contribute.
1. Treaty obligations
By 1992, 103 nations had become parties to the ICCPR, with another five, including the United States, having signed. On April, 12, 1992, as required by the Constitution, two-thirds of the United States Senate voted in favor of ratifying the ICCPR. 138 Cong. Rec. S4781, S4783. Under Article VI, Clause 2 of the Constitution, a treaty thus ratified has equal status to an act of Congress. That is, a treaty is law of the United States. See, e.g., Jordan J. Paust, International Law as Law of the United States 99-105, 120 (2d ed.2002). As with statutes, a later treaty supercedes inconsistent earlier-enacted statute, provided the treaty provision on the subject is self-executing. Whitney v. Robertson, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888).
When it ratified the ICCPR, however, the Senate also issued a declaration to the *174 effect that the substantive provisions of the ICCPR would not be self-executing.[42] 138 Cong. Rec. at S4784. I wholeheartedly agree with Judge Howard’s conclusion that this declaration is not binding on this court, and that further inquiry to determine whether the ICCPR is indeed non-self-executing is required. See infra at 184 (Howard, J., dissenting). I will not attempt to restate his sound reasoning here. However, even if this approach is not accepted, this court is not, as explained below, entirely without power to act.
If the ICCPR were not self-executing, the treaty, qua treaty, could not be invoked by a private citizen as the basis for a court of the United States to order that citizen’s full participation in the electoral processes of the United States. See Sosa, 124 S.Ct. at 2767 (recognizing the internationally-binding nature of the ICCPR, but observing that “the United States ratified the Covenant on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts”).[43] That is, a court of the United States could not use the requirement, established in Article 25 of the ICCPR, that “[e]very citizen shall have the right and opportunity ... to vote,” as the basis for enforcing an individual’s right to participate in the electoral processes of the United States, until such time as there has been municipal implementation of Article 25 by the enactment of intra-national legislation or constitutional provision. Neither could the courts of the United States order that the legislative branch of government live up to the obligations undertaken by the United States to “adopt such legislation or other measures as may be necessary to give effect to [the right to vote established in Article 25 of the ICCPR].” ICCPR art. 2, para. 2. Such an intromission would violate the constitutional principle of separation of powers. See Smith & Lee Assocs., Inc. v. City of Tay *175 lor, Mich., 102 F.3d 781, 797 (6th Cir.1996) (“Federal Courts do have jurisdiction and power to pass upon the constitutionality of Acts of Congress, but we are not aware of any decision extending this power in Federal Courts to order Congress to enact legislation. To do so would constitute encroachment upon the functions of a legislative body and would violate the time-honored principle of separation of powers of the three great departments of our Government.”). The majority’s contentions regarding the trumping of treaty provisions by the Constitution, maj. op. at 148, are thus inapposite, as I recognize the validity of this hierarchy and am not in any way proposing its violation.
That said, however, it is an undisputed fact that, contrary to the requirements of Article 2, Paragraph 2 of the ICCPR, the United States has taken no steps, to date, to implement the obligations undertaken therein. More directly on point, the United States has not enacted any legislation, passed any constitutional provision, or even put in motion any process directed at nationally enfranchising the nearly four million United States citizens residing in Puerto Rico, notwithstanding its ratification of the ICCPR and the Senate’s acknowledgment “[t]hat the United States understands that this Covenant shall be implemented by the Federal Government.” 138 Cong. Rec. S4781, S4784 (emphasis added). Accordingly, the United States is not in compliance with the binding obligations it undertook by signing and ratifying the ICCPR. The majority does not and cannot refute this undeniable fact, and, as explained below, the potentially non-self-executing nature of the ICCPR does not preclude our ability to make a declaration to that effect, see infra Part III.C.
2. Customary international law
Customary international law constitutes “those clear and unambiguous rules by which States universally[44] abide, or to which they accede, out of a sense of legal obligation and mutual concern.... ” Flores v. S. Peru Copper Corp., 406 F.3d 65, 84 (2d Cir.2003). The norm in question must be “specific, universal and obligatory,” In re Estate of Ferdinand Marcos, Human Rights Litig., 25 F.3d 1467, 1475 (9th Cir.1994), and must be a matter of “mutual, and not merely several concern.... ” Flores, 406 F.3d at 81 (quoting Filartiga v. Peña-Irala, 630 F.2d 876, 888 (2d Cir.1980)).
Although the test is demanding, the content of customary international law is not fixed and immutable. See Sosa, 124 S.Ct. at 2761-62 (“[W]e think courts should require any claim based on the present-day law of nations to rest on a norm of international character accepted by the civilized world and defined with a specificity comparable to the features of the 18th-century paradigms we have recognized.”); Filartiga, 630 F.2d at 881 (“[I]t is clear that courts must interpret international law not as it was in 1789, but as it has evolved and exists among the nations of the world today.”) (citing Ware v. Hylton, 3 U.S. (3 Dall.) 199, 1 L.Ed. 568 (1796) (distinguishing “ancient” from “modern” law of nations)). We look to international instruments setting forth “clear and unambiguous rules,” Flores, *176 406 F.3d at 84, and to other indications of widespread compliance motivated by a sense of legal obligation, by the nations of the world to establish the content of customary international law. See id. at 82-84; Restatement § 102(2) (“Customary international law results from a general and consistent practice of states followed by them from a sense of legal obligation.”).
The ICCPR, the UDHR, the American Declaration, the ACHR and the IADC are all evidence of the emergence of a norm of customary international law with an independent and binding juridical status. See Restatement § 102(3) (“International agreements ... may lead to the creation of customary international law when such agreements are intended for adherence by states generally and are in fact widely accepted.”). The right to equal political participation required by these instruments, as outlined above, is clear and unambiguous. The ICCPR, for example, admits of no doubt when it states that “[ejvery citizen shall have the right and the opportunity ... [t]o vote ... at genuine periodic elections which shall be by universal and equal suffrage.... ” ICCPR art. 25. The universal acceptance of this right to equal political participation is demonstrated by the prevalence of the right in a variety of multinational and regional agreements, and by the broad acceptance of those agreements by the countries of the world. Currently, for example, 163 nations of the 191-member United Nations are parties to the ICCPR, with an additional seven signatories that have not yet ratified the treaty.
The right to equal political participation, as evidenced by these international treaties, covenants, and declarations, is reinforced by what has become the overwhelming practice worldwide. See, e.g., Enrique Lagos & Timothy D. Rudy, In Defense of Democracy, 35 U. Miami Inter-Am. L.Rev. 283, 288-89 (2004) (“Democracy as an international law norm has been ‘emerging’ for some time, especially in the western hemisphere.”); Fernando R. Te-són, “Changing Perceptions of Domestic Jurisdiction and Intervention,” in Beyond Soverignty: Collectively Defending Democracy in the Americas 35 (Tom Farer ed., 1996) (“[tjhere can be little doubt that a principle of democratic rule is today part of international law”). From an exiguous minimum of only twenty-two democratic governments out of 154 sovereign states elected by universal suffrage in competitive multiparty elections in 1950, the number of democratic states to 120 out a total of 192 nations in the year 2000. Freedom House, Democracy’s Century: A Survey of Global Political Change in the 20th Century 2 (1999). While the system of democratic government may differ from country to country, the fundamental right of citizens to participate,[45] directly or indirectly, in the process of electing their leaders is at the heart of all democratic governments. See, e.g., James Crawford, “Democracy and the Body of International Law,” in Democratic Governance and International Law 93 (Gregory Fox & Brad R. Roth eds., 2000) (“[tjhat the will of the people is to be the basis of the authority of government is as good a summary as any of the basic democratic idea”). ■
We cannot overlook, and in fact we should take judicial notice of, the many official actions of the United States in promoting democratic elections throughout the world — not the least of which is its *177 support for the recently held national elections in Afghanistan and Iraq,[46] places where thousands of U.S. citizens from Puerto Rico serve, AP State & Local Wire, A Package of News Briefs from the Caribbean, Mar. 19, 2005 (reporting 1800 Puerto Ricans currently stationed in Iraq, Kuwait, Afghanistan and Bosnia), at least twenty-five of whom have lost their lives in support of the rights of the citizens of those countries to vote. Id. The situations in Iraq and Afghanistan present the further anomaly of two classes of U.S. citizens, both fighting and dying side by side, only one of which was able to vote for its Commander in Chief. See Uniformed and Overseas Citizens Absentee Voting Act § 102, 42 U.S.C. § 1973ff-l(a) (requiring states to permit absentee voting by overseas military personnel).
But most important, in what may be the ultimate example of not seeing the forest for the trees, there are few countries in the world in which the right to vote is as exalted as it is in the United States. See Wesberry, 376 U.S. at 17, 84 S.Ct. 526 (“No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live.”). Furthermore, the right to vote is directly protected by Federal statute, which provides both civil and criminal penalties for interference therewith, see Voting Rights Act § 12, 42 U.S.C. § 1973, by several constitutional amendments, see U.S. Const., amend. XV (prohibiting discrimination in voting rights because of race); id. amend. XIX (prohibiting voting discrimination by reason of gender); id. amend. XXIII (granting the residents of the District of Columbia the right to vote for the President of the United States); id. amend. XXIV (prohibiting poll tax); id. amend. XXVI (extending the right to vote to all citizens over the age of 18); see also, e.g., Proclamation No. 7806, 69 Fed.Reg. 52,987 (Aug. 26, 2004) (concerning women’s right to vote); Proclamation No. 7584, 67 Fed.Reg. 55,317 (Aug. 23, 2002) (concerning Afghan women’s right to vote); Proclamation No. 6924, 61 Fed.Reg. 51,767 (Oct. 2, 1996) (concerning right to vote for citizens aged between 18 and 21); Der Reich-man, Bush Promotes Democracy in Hemisphere of the Americas, San Juan Star, Jun. 5, 2005, at 11 (in a speech before the Organization of American States, President Bush urged that entity to monitor democratic progress in the hemisphere, check the credibility of elections, and offer a vision of hope “founded on representative government”).
In light of the proliferation and widespread acceptance of, and compliance with, international instruments that specifically require a right to equal political participation by all citizens, we should conclude that such a right is a norm of customary international law.
At least some components of customary international law are incorporated into United States domestic law as federal common law. See Sosa, 124 S.Ct. at 2764-65 (recognizing a class of international law claims as judicially enforceable federal common law); Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir.1995)(terming it a “settled *178 proposition that federal common law incorporates international law”); 13B Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice & Procedure: Jurisdiction 2d, § 3585, at 329 (2d ed., 1984) (“[T]oday it is not difficult to conclude that customary international law is part of federal common law.... ”).
The Supreme Court in Sosa recognized that certain claims based on customary international law, as a result of their status as federal common law, can be enforced in the federal courts under the Alien Tort Statute, 28 U.S.C. § 1350. See Sosa, 124 S.Ct. 2764-65. Although the Alien Tort Statute grants jurisdiction only over “causes where an alien sues for a tort only in violation of the law of nations or a treaty of the United States,” 28 U.S.C. § 1350, the Sosa court did not foreclose the possibility of directly enforcing some customary international law claims through the federal common law when federal jurisdiction is based on other grounds. See Sosa, 124 S.Ct. at 2765, n. 19 (expressing doubt, but leaving open possibility of common law claims for violation of customary international law when jurisdiction is based on 28 U.S.C. § 1331); cf. id. at 2761 (noting that, at least under Alien Tort Statute, no legal development “has categorically precluded federal courts from recognizing a claim under the law of nations as an element of common law”). In light of legislative history that indicates Congress’s intent to extend federal jurisdiction over cases “arising under” federal law to the fullest extent the Constitution would allow, see 2 Cong. Rec. 4986-87 (1874) (“The [Judiciary] [A]ct of 1789 did not confer the whole [judicial] power which the Constitution conferred.... This bill does.... This bill gives precisely the power which the Constitution confers — nothing more, nothing less.”), we should conclude that the jurisdiction conferred by 28 U.S.C. § 1331 can encompass claims arising under customary international law as incorporated into the federal common law.
The Supreme Court limited recognizable claims, however, to “a narrow class of international norms.” Sosa, 124 S.Ct. at 2764. Specifically, “courts should require any claim based on the present-day law of nations to rest on a norm [1] of international character [2] accepted by the civilized world and [3] defined with a specificity comparable to the features of the 18th-century paradigms” that were recognized at that time as actionable violations of the law of nations. Id. at 2761-62. These were violations of international law that “admitted] of a judicial remedy and at the same time threatened] serious consequences in international affairs,” such as the 18th-century prohibitions on violation of safe conducts, infringement of the rights of ambassadors, and piracy. Id. at 2756.
As established above, the first two requirements- — -international character and broad acceptance — have been met in the case of the customary international law requirement that citizens be permitted full and equal participation in their government. Furthermore, this norm is defined with a specificity comparable to the international law norms recognized as actionable at the founding of our nation. Its requirements are clear and definite,[47] and the failure to fulfill it can indeed threaten serious consequences in international affairs, as evidenced by the pressure exerted by the United States and other govern *179 ments on non-democratic regimes abroad. Cf. Case 11.204, Inter-Am. C.H.R. 727, OEA/ser.L/V/II.118, doc. 5 rev. 2 (2003) (finding by Inter-American Commission of Human Rights that the United States “is responsible for violations of Petitioners’ rights under Articles II and XX of the American Declaration by denying [citizens of the District of Columbia] an effective opportunity to participate in their federal legislature”).
Because the right to equal political participation by all citizens meets all of the elements required of an enforceable norm of customary international law, there should be no question that it is incorporated into the domestic law of the United States as federal common law to be applied by the federal courts. See Sosa, 124 S.Ct. at 2764-65. Moreover, it is clear that the United States is in violation of that norm with respect to the residents of Puerto Rico. Were we to avoid this conclusion, we would not just be “avert[ing][our] gaze entirely from [an] international norm intended to protect individuals,” id., but would be placing our heads into the sand to avoid seeing the obvious.
In my view, the majority’s refusal to incorporate the clear and specific customary international law norm requiring equal political participation into federal common law contravenes both the specific language of the Constitution, see U.S. Const, art. VI, cl. 2, and relevant Supreme Court doctrine, see Sosa, 124 S.Ct. at 2761-62.
The majority’s concern that customary international law is a “diffuse and often highly uncertain body of norms,” maj. op. at 151, if true regarding other areas of customary international law, is certainly not true of the right to vote, as demonstrated above. Moreover, the majority’s contention that “[i]f there exists an international norm of democratic government, it is at a level of generality so high as to be unsuitable for importation into domestic law,” maj. op. at 151, misses the point. The international norm at issue here is not “democratic government” generally, but the right to vote in equality with all other citizens of one’s nation. The majority studiously fails to provide any example, in any democratic country, in which citizens are classified into voting and non-voting categories. Its reference to Great Britain as an example of diversity in democratic governments in which citizens neither vote for the head of state nor directly for the governing party, hardly proves the point or even stands for the proposition that customary international law tolerates unequal voting rights among citizens of the same country. In Great Britain, the monarch is only symbolically the head of state. Furthermore, I was under the impression that in 1776 we rejected Great Britain’s views regarding colonial government.
C. Remedy
We commence with the premise that plaintiffs-appellants have the right to equal political participation as citizens of the United States, pursuant to customary international law and the ICCPR, both of which are binding on the United States. As observed, the United States is currently in violation of these requirements. Given the failure by the United States to take steps to rectify this clear violation of international law, notwithstanding its agreement to do so, see, e.g., Exec. Order No. 13,107, 63 Fed.Reg. 68, 991 (Dec. 10, 1998), this court ought to take such measures as are necessary to protect a discrete group of citizens that is completely under the sovereignty of the United States. See United States v. Carolene Prods. Co., 304 U.S. 144, 152 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938) (“[P]rejudiee against discrete and insular minorities may be a special condition, which tends seriously to curtail *180 the operation of those political processes ordinarily to be relied upon to protect minorities, and ... may call for correspondingly more searching judicial inquiry.”).
Although, assuming the ICCPR is not self-executing, we cannot order legislative action to bring the United States into compliance with its international obligations, a stop-gap measure is available and is justified by plaintiffs-appellants’' predicament. The ^Declaratory Judgment Act, 28 U.S.C. § 2201(a), provides that:
In a case of actual controversy within its jurisdiction ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.
Under this Act, this court may declare the rights, under the ICCPR and customary international law, of the United States citizens residing in Puerto Rico. “It is emphatically the province and duty of the judicial branch to say what the law is.” Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177, 2 L.Ed. 60 (1803). The Act provides the courts with the option of “declaring] the rights and other legal relations of any interested party seeking such declaration, whether or not 'farther relief is or could be sought.” 28 U.S.C. § 2201(a) (emphasis added), particularly when a declaratory judgment “will serve a useful purpose in clarifying and settling the legal relations in issue.... ” Aetna Cas. & Sur. Co. v. Quarles, 92 F.2d 321, 325 (4th Cir.1937) (internal quotation marks omitted).
The power to provide declaratory relief extends to the power to clarify and settle the legal relations between the United States and the inhabitants of territories under Federal administration. See United States v. Sanchez, 992 F.2d 1143, 1150-53 (11th Cir.1993), rev’d in part on other grounds, 3 F.3d 366 (11th Cir.1993) (determining that Puerto Rico is not a separate sovereign for purposes of the double jeopardy clause); see also United States v. Lopez Andino, 831 F.2d 1164, 1167-68 (1st Cir.1987) (holding that Puerto Rico is a separate sovereign for double jeopardy purposes). “Courts of the United States have final authority -to interpret an international agreement for purposes of applying it as law of the United States.” Juda v. United States, 13 Cl.Ct. 667, 678 (Cl.Ct.1987).
1. Redressability
This type of declaratory relief in the present case is fully consistent with the Declaratory Judgment Act, because it is substantially likely that a declaration by this Court that the United States is in violation of international law will result in some form of relief to the United States citizens who reside in Puerto Rico. See Utah v. Evans, 536 U.S. 452, 463-464, 122 S.Ct. 2191, 153 L.Ed.2d 453 (2002). In Evans the Court held that the “redressa-bility” element of standing under Article 111 and the Declaratory Judgment Act[48] was met in a situation in which it was “ ‘substantially likely’ ” that a non-party, co-equal branch of government would abide by a federal court’s interpretation of the law “ ‘even though they would not be directly bound by such a determination.’ ” Id. at 460, 122 S.Ct. 2191 (quoting Franklin v. Massachusetts, 505 U.S. 788, 803, 112 S.Ct. 2767, 120 L.Ed.2d 636 (1992)). Standing was established because “the *181 practical consequence of [a court order declaring a census-taking method unlawful] would amount to a significant increase in the likelihood that the plaintiff would obtain relief [from the President] that directly redresses the injury suffered.” Id. at 464, 122 S.Ct. 2191 (collecting cases in which standing has been found under similar circumstances).
Similarly, in Juda, one can find an example of the legislative branch following the judiciary’s interpretation of international law. In that case, the inhabitants of the Marshall Islands — which the United States held under trusteeship from the United Nations — challenged the United States’ attempt to unilaterally terminate the Trusteeship Agreement by way of Presidential proclamation, which would have contravened the international agreement with the United Nations. The Claims Court declared that the Trusteeship remained in effect de jure as a matter of international law, and set forth the procedure to be followed by the United States to end it under international law. Id. at 678-82. Although not bound by that judicial roadmap, Congress did in fact follow it. See Joint Resolution to Approve the “Compact of Free Association” between the United States and the Government of Palau, Pub.L. No. 99-658, § 101, 100 Stat. 3672 (1986); U.N. Security Counsel Res. 683 (Dec. 22, 1990) (terminating Trusteeship Agreement).
The parallel between these cases and the present situation is self-evident. Judge Lipez’s attempt to distinguish them on the basis that “the likelihood that Congress and the President would follow the court’s advice was not just ‘substantial,’ [in those cases], it was a near certainty .... [but][t]here is nothing approaching such certainty here,” supra at 157 (Lipez, J., concurring), is unconvincing. With due respect, it is the concurrence that engages in speculation. It seems to me that the prediction that Congress would ignore a declaratory judgment of this court that the United States is not in compliance with its international obligations is simply contrary to experience. Juda, whether dicta or not, see supra at 157 (Lipez, J., concurring), bears this out. We live in a country of laws in which the norm is for all branches of government to respect and comply with the decisions of the courts, irrespective of how disputed they may be. See, e.g., Bush v. Gore, 531 U.S. 98, 121 S.Ct. 525, 148 L.Ed.2d 388 (2000). I cannot countenance that Congress — nor, for that matter, the Executive, which negotiated the ICCPR and is thus intimately involved and committed — would ignore a judgment of this court declaring that the government has taken no action to comply with an international obligation of the United States, negotiated and agreed to by the Executive Branch with the advice and consent of the Senate.
The difficulty, complexity, or length of the process required for the United States to comply with the law of the land is irrelevant, as it has never been a test for redressability of a wrong. Cf. Brown v. Bd. of Educ., 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) (ordering racial desegregation of schools occur “with all deliberate speed”). The U.S. citizens of Puerto Rico have waited over one hundred years to regain the voting rights they lost when the U.S. invaded in 1898. A declaratory judgment would be of some help in speeding up the process of recovering these rights.
Regardless, however, of the inappropriateness and unlikelihood of Congressional inaction in response to a judicial declaration of the rights at issue, it cannot be denied that we lack authority to order Congress to act. Even if Congress chooses to continue on its course of inaction, *182 however, our declaration of the plaintiffs’ rights under the ICCPR and customary international law would, itself, provide a form of redress. On this point, Federal Election Commission v. Akins, 524 U.S. 11, 118 S.Ct. 1777, 141 L.Ed.2d 10 (1998), is instructive. In Akins, a group of voters filed an administrative complaint with the Federal Election Commission (“FEC”) asking it to force a certain political organization to comply with the reporting requirements for political action committees (“PACs”). See id. at 17, 118 S.Ct. 1777. The FEC dismissed the complaint on the ground that the organization did not fit the definition of a PAC under federal law. See id. The voters appealed the FEC’s dismissal of their complaint and the FEC defended on the ground that the voters’ claim was not redressable. See id. at 19. The FEC argued that, even if it misinterpreted the definition of a PAC, it maintained the option not to act on the voters’ complaint as a matter of prosecutorial discretion. See id. at 25, 118 S.Ct. 1777. The Court disagreed that the FEC’s discretionary authority deprived the voters of standing. See id. The Court explained that, even though the FEC might ultimately decline to act on the voters’ complaint, the voters’ injury was redressed by assuring that the FEC’s discretionary decision was based on a correct understanding of the relevant law.
This case presents an analogous circumstance. The plaintiffs have alleged that Congress has an obligation under the ICCPR and customary international law to further their right to vote for President and that since the ICCPR was ratified, Congress has taken no action in this regard. It is possible that Congress has not acted in accord with its obligations because it is unaware of them. By issuing a declaration stating the plaintiffs’ rights under the ICCPR and customary international law, the court can correct this potential misunderstanding. To be sure, an Article III court cannot order Congress to pass a law, just as it cannot order the executive to prosecute a particular case. But, as in Akins, a declaration can ensure that the government actor in question (here Congress) exercises its responsibility with a correct understanding of the relevant legal principles. This is no guarantee that the Congress will exercise its discretion favorably to the plaintiff. But, as Akins makes clear, there is no such requirement. See id. at 25, 118 S.Ct. 1777; Evans, 536 U.S. at 464, 122 S.Ct. 2191 (stating that re-dressability is established where court action “would amount to a significant increase in the likelihood that the plaintiff would obtain the relief that directly redresses the injury suffered”).
Ultimately, I simply do not agree with Judge Lipez’s reading of the Utah and Juda cases, nor with his conclusions regarding redressability. Obviously, the ideal remedy would be if we could order that plaintiffs be allowed to vote. Barring a finding that the ICCPR is self-executing, that remedy is not available. Continued non-compliance, however, is a circumstance that cannot be ignored any longer. The honor and credibility of the United States are at stake.
Plaintiffs-appellants, citizens of the United States, are denied the right to vote for the offices of President and Vice President of our nation in violation of the ICCPR and customary international law. Further, it is an unquestionable fact that the United States has not met its obligation under the ICCPR to take steps toward allowing these citizens to exercise this fundamental right. See ICCPR art. 2, para. 2. It must be assumed that the United States will give effect to a judicial declaration stating its failure to meet its obligations in this respect, and, at a minimum, we must ensure that any future inaction by the gov *183 ernment is not based on an inaccurate understanding of its obligations under international law.
2. “Embarrassment” v. Equality
If the majority were to conclude that plaintiffs-appellants’ allegations are not supported by the law, although I obviously disagree with this conclusion, I would accept it as part of the judicial process in which diversity of opinion is a fact of judicial review. However, I cannot accept, and am highly disturbed by, the proposition espoused by the majority that the outcome of this appeal should in any way be dictated by its perception that a declaration by this court that the United States has failed to comply with its treaty obligations might “embarrass” the United States and “could be trumpeted as propaganda in international bodies and elsewhere.” Maj. op. at 150-51. These statements are worrisome because they demonstrate a misperception of the role of federal courts vis-a-vis treaties and other international law. The interpretation of treaties and international law, as an integral part of the law of the land, is a non-delegable judicial duty and function that cannot be avoided by this court. Indeed, federal courts are the final interpreters of treaties. Juda, 13 Cl.Ct. at 678. The United States is just another party in this case, as it is in the thousands that are heard before the federal courts throughout the nation. It has no higher standing than any other party, and is entitled to no higher privilege than private citizens. It is precisely because the courts of the United States are perceived by the world at large as upholding these high standards of impartiality that a declaration exposing the government’s failure to comply with its treaty obligations, rather than “embarrassing” the U.S., as the majority suggests, would have a highly salutary effect by showing the world that we practice what we preach: the rule of law.
Embarrassment indeed! The U.S. should be embarrassed at its denying equal rights to four million of its citizens in this day and age. That fact itself — particularly in light of the government’s intense encouragement of democratic reform in other nations and purported commitment to international instruments that guarantee equal political participation by all citizens — could be “trumpeted as propaganda in international bodies and elsewhere.” Maj. op. at 150-51. Was it “embarrassment” that finally reversed Plessy? If embarrassment is what it takes to give equal rights to the United States citizens of Puerto Rico, maybe a dose is appropriate.
III.
There comes a point when the courts must intervene to correct a great wrong, particularly one of their own creation, because the political branches of government cannot or will not act. See, e.g., Brown v. Bd. of Educ., 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873. This case is such a crossroads in history. This court cannot further “avert its gaze,” Sosa, 124 S.Ct. at 2764-65, without becoming an accomplice to this monumental injustice to Puerto Rico’s nationally disenfranchised United States citizens.
Shortly before the Civil War, Abraham Lincoln said: “As I would not be a slave, so I would not be a master. This expresses my idea of democracy. Whatever differs from this, to the extent of the difference, is no democracy.” President Abraham Lincoln, Address to Indiana Regiment (Aug. 1, 19858) in II The Collected Works of Abraham Lincoln 532 (Roy P. Basler ed., 1953) (emphasis removed from original). Substitute “colon *184 ized” for “á slave” and “colonizer” for “master” in this quote, -and we are where the United States citizens of Puerto Rico find themselves today in their subservient political condition within the United States’ political hegemony.
The opinion of the district court should therefore be reversed, and the case remanded for the entry of a declaratory judgment to the effect that the United States has taken no steps to meet its obligations under the ICCPR and customary international law to grant equal voting rights to all citizens in the election of the President and Vice President of the United States.

E pluribus unum.

. I acknowledge the participation of amici, whose briefs contributed to the clarification of various important issues. I regret that not all amici were granted the opportunity to express themselves at oral argument.

. Is this the constitutional equivalent of "rest in peace”? Of course, if Judge Lipez and Judge Campbell are correct that we lack jurisdiction to consider plaintiffs' claim, then the majority's various conclusions on the merits would be mere dicta, lacking any prece-dential value. "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause.” Ex parte McCardle, 7 Wall. 506, 514, 19 L.Ed. 264 (1868) (quoted in Steel Co. v. Citizens for a Better Environment, 523 U.S. 83, 94-95, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998)). Furthermore, if the concurring opinion is correct, the majority is issuing an advisory opinion of the same kind that Judge Lipez claims results from the declaratory judgment that I propose.

. Reducing the majority and concurring opinions to their bare bones, the former leaves the four million nationally disenfranchised United States citizens residing in Puer-to Rico to claim their rights through a nonexistent political forum, while the latter deny an existing judicial forum the authority to state the actuality of an undeniable fact. Both outcomes leave the citizens in question in an unjust legal limbo.

. The Act states that ''[i]n a case of actual controversy within its jurisdiction, ... any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.” 28 U.S.C. § 2201(a).

.U.S. Const, art. VI, cl. 2 ("This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of. the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding.”).

. In what must be the height of euphemism, the majority refers to this turn of events as Puerto Rico's becoming "associated” with the United States. Maj. op. at-. A similar, but more pernicious, mischaracterization follows its description of the congressional enactments that authorized local self-government for Puerto Rico, which the majority calls an "agreement” for a "unique 'Commonwealth' status,” id., and which the majority states resulted in the current “negotiated relationship,” id. at- (emphasis in original), between the U.S. and Puerto Rico. Of course, these statements are simply inaccurate and do not reflect the facts. There is no room for doubt that Public Law 600, 64 Stat. 319 (1950) (codified at 48 U.S.C § 731b, et seq.) (authorizing Puerto Rico to enact a constitution for local self-government), and its sequel, Public Law 447, 66 Stat. 327 (1952) (resolution approving Puerto Rico’s Constitution), did nothing to change the underlying constitutional status of Puerto Rico as an unincorporated territory, subordinated to Congress' plenary powers under the Territorial Clause, U.S. Const., Art. IV, § 3, cl. 2. See generally David M. Helfeld, The Historical Prelude to the Constitution of the Commonwealth of Puer-to Rico, 21 Rev. Jur. U.P.R. 135 (1952); David M. Helfeld, Congressional Intent and Attitude Toward Public Law 600 and The Constitution of the Commonwealth of Puerto Rico, 21 Rev. Jur. 255 (1952) (containing numerous citations to the Congressional record and reports indicating that these measures did not change Puerto Rico's basic status under the Constitution nor Congress’ powers over this unincorporated territory); Keith Bea, Congressional Research Service, Political Status of Puerto Rico: Background, Options, and Issues in the 109th Congress, at CRS-2 (updated Jun. 6, 2005) ("While the approval of the commonwealth constitution marked a historic change in the civil government for the islands, neither it, nor the public laws approved by Congress in 1950 and 1952, revoked statutory provisions concerning the legal relationship of Puerto Rico to the United States. This relationship is based on the Territorial Clause of the U.S. Constitution.”). It is not just the majority's inaccuracies in describing the colonial relationship between Puerto Rico and the United States to which I object. The majority's unfortunate choice of language obviously favors the colonial condition and this bias will, without any question or doubt, be exploited politically.
The debate over what status Puerto Rico ought to have with respect to the United States is, of course, hotly contested. What that status should be is not the issue before us. The only issue is whether the U.S. citizens in Puerto Rico should have the right to vote nationally. The right to vote will benefit all U.S. citizens residing in Puerto Rico regardless of their position on status, since it will give them a meaningful political voice until that issue is resolved, and on that issue itself.

. In fact, Puerto Rico had been represented in the Spanish Cortes as early as 1812, see Constitución politica de la Monarquía Española (promulgated in Cadiz on Mar. 18, 1812), as a result of which its one deputy, Ramón Powers, became Vice President of the Cortes in 1812. Thereafter, depending on the vagaries of Spanish politics, constitutions, and special laws enacted to apply to Spain's overseas provinces and colonies, Puerto Rico was variously represented in the Cortes.

. John Hay, U.S. Ambassador to Great Britain in 1898, and a leading expansionist of the time, wrote to then Colonel Theodore Roosevelt, at the time of only Rough Rider fame, "[i]t has been a splendid little war; begun with the highest motives, carried on with magnificent intelligence and spirit, fa *161 vored by that fortune which loves the brave.” Frank Freidel, The Splendid Little War 3 (1958); Hugh Thomas, Cuba, The Pursuit of Freedom 404 (1971).

. See generally José Trías Monge, Puerto Rico: The Trials of the Oldest Colony in the World (1997).

. U.S. troops were received in Ponce, Puerto Rico's second largest city, by the municipal band playing the "Star Spangled Banner,” and General Nelson Miles, commanding general of the expeditionary force wired Washington: "Please send any national colors that can be spared, to be given to the different municipalities.” 1 Messages and Documents, 1898-1899.

. See Antonio Salvador Pedreira, El Año Terrible del 87: Sus Antecedentes y Sus Conse-cuencias, Ed. Edil, Rio Piedras (1974).

. See Treaty Between the United States of America and the French Republic, April 30, 1803, U.S.-Fr. art. Ill, 8 Stat. 200, 202 (Louisiana Purchase); Treaty of Amity, Settlement, and Limits, Between the United States of America and His Catholic Majesty, Feb. 22, 1819, U.S.-Spain, art. 6, 8 Stat. 252 (acquisition of Florida); Treaty of Guadalupe Hidal-go, Feb. 2, 1848, U.S.-Mex., art. VIII, 9 Stat. 922 (acquisition of California); Gadsen Treaty, Dec. 30, 1853, U.S.-Mex., art. V, 10 Stat. 1031 (acquisition of Arizona); Treaty concerning the Cession of Alaska, Mar. 30, 1867, U.S.-Russ., art III, 15 Stat. 539 (acquisition of Alaska); Act of Apr. 30, 1900, ch. 1, § 4, cl. 339, 31 Stat. 141 (providing a government for Hawaii). Hawaii was actually annexed in 1898, see Joint Resolution To provide for annexing the Hawaiian Islands to the United States, 30 Stat. 750 (1898), two years before citizenship was granted.

.Between 1900 and 1932, Puerto Rico was officially misspelled as "Porto Rico,” as a result of the incorrect spelling of the Island's name in the English version of the Treaty of *162 Paris in 1898. This incorrect spelling was thereafter used in the Foraker Act in 1900, after which it took thirty-two years to persuade Congress that "Porto” is Portuguese and that the correct Spanish name should be restored. This was finally done by joint resolution on May 17, 1932. Joint Resolution to change the name of "Porto Rico” to "Puerto Rico,” ch. 190, 47 Stat. 158 (1932).

. A national, as distinguished from a citizen, who is "a member of a political community, owing allegiance to the community and being entitled to enjoy all its civil rights and protections,” Black’s Law Dictionary 261 (8th ed.2004), is a person who owes allegiance to a state but does not enjoy the full rights of a citizen. See José A. Cabranes, Citizenship and the American Empire, 127 U. Pa. L.Rev. 391 (1978); see also Gonzales v. Williams, 192 U.S. 1, 12-13, 24 S.Ct. 177, 48 L.Ed. 317 (1904); cf. Dred Scott v. Sandford, 60 U.S. (19 How.) 393, 404, 15 L.Ed. 691 (1857) (holding that "a negro of African descent, [whose] ancestors were of pure African blood, and were brought into this country and sold as slaves,” id. at 397, was not entitled to the privileges and immunities of the Constitution accorded to citizens).

. De Lima v. Bidwell, 182 U.S. 1, 21 S.Ct. 743, 45 L.Ed. 1041 (1901); Goetze v. United States, 182 U.S. 221, 21 S.Ct. 742, 45 L.Ed. 1065 (1901); Dooley v. United States, 182 U.S. 222, 21 S.Ct. 762, 45 L.Ed. 1074 (1901); Armstrong v. United States, 182 U.S. 243, 21 S.Ct. 827, 45 L.Ed. 1086 (1901); Downes v. Bidwell, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088 (1901); Huus v. New York & Porto Rico Steamship Co., 182 U.S. 392, 21 S.Ct. 827, 45 L.Ed. 1146 (1901). See generally Juan R. Torruella, The Supreme Court and Puerto Rico: The Doctrine of Separate and Unequal (1985).

. As Finely Peter Dunne, a popular political wit of the time said about the Insular Cases, "[n]o matter whether the’ constitution follows th' flag or not, th' supreme court follows th’ flection results.” Finley Peter Dunne, Mr. Dooley’s Opinions 26 (1901). Whether the Constitution applied in the territories acquired as a result of the Spanish-American War was, of course, central to the Insular Cases, and a major issue in the 1900 elections, which were won by McKinley and those who favored overseas territorial expansion without extension of the Constitution. See La Feber, "The Elections of 1900,” in 3 History of American Presidential Elections, 1789-1968 1877 (Arthur M. Schlesinger, Jr. ed., 1971).

. See, e.g., Selden Bacon, Territory and the Constitution, 10 Yale L.J. 99 (1901); William W. Howe, The Law of Our New Possessions, 9 Yale L.J. 379 (1900); Charles C. Langdell, The Status of Our New Territories, 12 Harv. L.Rev. 365 (1899); Carman F. Randolph, Constitutional Aspects of Annexation, 12 Harv. L.Rev. 291 (1898); James Bradley Thayer, Our New Possessions, 12 Harv. L.Rev. 464, 467 (1899) ("Let me at once and shortly say that, in my judgment, there is no lack of power in our nation — of legal, constitutional power, to govern these islands as colonies, substantially as England might govern them .... ”); cf. Simeon E. Baldwin, The Constitutional Questions Incident to the Acquisition and Government by the United States of Island Territory, 12 Harv. L.Rev. 393 (1899). See generally Frederic R. Coudert, The Evolution of the Doctrine of Territorial Incorporation, 26 Co-lum. L.Rev. 823 (1926).

.In Downes, 182 U.S. 244, 21 S.Ct. 770, 45 L.Ed. 1088, Justice Brown delivered the judgment of the court. Justice White delivered a concurring opinion joined by Justices Shirra and McKenna. Justice Gray also delivered a concurring opinion. Chief Justice Fuller dissented, with Justices Harlan, Brewer and Peckham joining. Justice Harlan also filed a separate dissent.

. For a full account see Cabranes, supra note 29.

. For an in-depth account of the events leading up to the passage of the Jones Act, particularly the acrimonious debates that preceded its passage, see Cabranes, supra note 29, at 471-85.

. Chief Justice Taft who, of course, had been President of the United States from 1909 to 1912, had a long and somewhat fractious experience with the United States' newly acquired colonies. He did not need to be influenced by academics on questions of expansionism or how to deal with the colonies. In 1900, he became the first civilian governor of the Philippine Islands at a time when the Aguinaldo Insurrection — a war that led to thousands of U.S. casualties and over 100,000 civilian deaths, many more than in the entire Spanish-American War- — -was in full swing. See generally Brian McAllister Linn, The Philippine War, 1899-1902 (2000). In 1904, while Secretary of War under President Theodore Roosevelt, Taft oversaw not only the Philippines, but also Cuba and Puerto Rico. In 1906, he was sent to Cuba as its provisional governor under the Platt Amendment to the Cuban Constitution, which allowed the United States to intervene in Cuban affairs during times of "unrest.” However, it was during his time as President that Taft became openly disenchanted with Puerto Rico and its inhabitants as a result of the so-called Budget Crisis of 1909. See Truman R. Clark, President Taft and the Puerto Rican Appropriations Crisis of 1909, 26 The Americas 152-70 (1969). President Taft accused Puerto Rico's elected leaders of irresponsibility and political immaturity, and suggested that too much power had been given to Puerto Ricans "for their own good.” Message from President Taft to Congress, S.Rep. No. 61-10, at 5. See generally Henry F. Pringle, The Life and Times of William Howard Taft (1939).

. The debate over what status Puerto Rico ought to have with respect to the United States is, of course, hotly contested. The right to vote will benefit all U.S. citizens residing in Puerto Rico, regardless of their position on status since it will give them a meaningful political voice until that issue is resolved.

. Although I place Judge Lipez’s concurrence in a separate category, I disagree with his conclusion that we lack jurisdiction to declare the Congress has failed to take any action to comply with its international obligations. This failure affects the "rights and legal relations of an interested party,” the U.S. citizens in question, "whether or not further relief is or could be sought.” 28 U.S.C. § 2201(a). There is nothing hypothetical about plaintiffs' national disenfranchisement. We have the authority to acknowledge that condition, and Congress’ failure to take any action to correct it despite having committed, under binding international law, to do so. Judge Lipez misstates the issues as framed by my dissent when he focuses on Congress' failure "to either admit[] Puerto Rico as a state or propose[ ] ... [a constitu *169 tional] amendment.” Supra at 21 (Lipez, J., concurring). Although those are among the remedial options available, it makes no difference whether it be these or other alternatives that Congress adopts. The only unavailable option is to do nothing, because that is a violation of an international pledge which has become United States law. Failure to act has legal consequences that create a case and controversy legally cognizable by a declaratory judgment even if relief is not available.

. Customary international law is part of the "Law[] of the United States” within the meaning of Article III. See, e.g., Sosa, 124 S.Ct. at 2764 ("[T]he domestic law of the United States recognizes the law of nations.”); see also Restatement § 111, cmt. e; Louis Henkin, International Law as Law in the United States, 82 Mich. L.Rev. 1555, 1566 (1982).

. In addition, the American Convention of Human Rights ("ACHR”), adopted in 1969 and signed by twenty-six countries (not including the United States) between 1969 and 2000, provides in Article 23(1) that "every citizen shall enjoy ... rights and opportunities: ... to vote ... in genuine periodic elections, which shall be by universal and equal suffrage....” ACHR, opened for signature Nov. 22, 1969, 1144 U.N.T.S. 123 (entered into force Jul. 18, 1978).

. The United States further agreed to an enforcement mechanism for the realization and security of the rights established in the ICCPR. Each State Party undertook "[t]o ensure that any person whose [ICCPR] rights or freedoms ... are violated shall have an effective remedy,” to ensure that these rights would be “determined by competent judicial, administrative or legislative authorities, or by any competent authority provided for by the legal system of the State,” and that "the possibilities of judicial remedy" would be developed. Id. art. 2, para. 3 (emphasis added).

. The Senate also made actual reservations under which its obligations to comply with various provisions of the ICCPR were limited. See 138 Cong. Rec. S4781, S4783 (stating, inter alia, that the United States will not take any steps to comply with ICCPR Article 20 that would infringe on the right of free speech and association; reiterating the applicability of capital punishment for adults and minors; deeming ICCPR Article 7 prohibitions on "cruel, inhuman or degrading treatment or punishment” to apply only to treatment deemed "cruel and unusual” under domestic constitutional law; declining to adhere to ICCPR Article 15, Paragraph 1; and reserving the right to treat juveniles, under certain circumstances, as adults, notwithstanding the provisions of ICCPR Article 10, Paragraphs 2(b) and 3, and Article 14, Paragraph 4).
In contrast, no reservations or other limitations to the specific obligations contained in Article 25 were made, aside from the declaration of non-self-execution applicable to all substantive articles of the ICCPR. Id. This is indicative of the Senate's intent to accept the obligation of full compliance with that provision of the ICCPR. See also id. at S4784 (adding the Understanding "[t]hat the United States understands that this Covenant shall be implemented by the Federal Government to the extent that it exercises legislative and judicial jurisdiction over the matters covered therein, and otherwise by the state and local governments,” and that "the Federal Government shall take measures appropriate to the Federal system” to ensure that "state or local governments may take appropriate measures for the fulfillment of the Covenant” for matters under their jurisdiction) (emphasis added); Exec. Order No. 13,107, 63 Fed.Reg. 68,991 (Dec. 10, 1998) ("It shall be the policy and practice of the Government of the United States, being committed to the protection and promotion of human rights and fundamental freedoms, fully to respect and implement its obligations under international human rights treaties to which it is a party, including the ICCPR....”).

. As Judge Howard notes, this statement from Sosa is not at odds with the conclusion that the non-self-execution declaration is not, itself, binding on the courts. See infra at 191, n.63 (Howard, J., dissenting).

. The universality requirement does not imply that compliance with customary international law norms be perfect. "States need not be universally successful in implementing the principle in order for a rule of customary international law to arise. If that were the case, there would be no need for customaiy international law. But the principle must be more than merely professed or aspirational." Flores, 406 F.3d at 80; see also Restatement § 102, cmt. b.

. See, e.g., Freedom House, List of Electoral Democracies, at www.freedomhouse.orglre-searchlfreeworld/2003/tables.htm (2003) (listing 121 countries which have at least four different systems of democracy including parliamentary, federal parliamentary, presidential parliamentary, and federal presidential parliamentary).

. See Afghans Studying the Art of Voting, N.Y. Times, Oct. 4, 2004, at A1 (discussing Afghanistan's first ever democratic elections); David E. Sanger & Stephen R. Weisman, The Iraqi Election: The White House; Bush Hails Vote, N.Y. Times, Jan. 31, 2005, at A1 (reporting that President Bush called the election in Iraq a "triumphant moment in his efforts to spur democratic movements throughout [the] Middle East”); Steven R. Weisman, U.S. Asks Others to Pressure Iraq to Be Inclusive, N.Y. Times, Jun. 12, 2005, at A1 (reporting that U.S. seeks to "enlist [] Europe, the Arab world and the United Nations to pressure the Bagdad government to include minorities in the political process”).

. Compare the language of the international instruments described above with the extended discussion of the definition of "piracy” in United States v. Smith, 18 U.S. (5 Wheat.) 153, 160-63, 5 L.Ed. 57 (1820) and the comment in the dissent that the reason such lengthy discussion and definition was the "uncertainty which it was known existed on the subject in the law of nations....” Id. at 170-71 (Livingston, J., dissenting).

. The “case-or-controversy” requirements of Article III and the Declaratory Judgment Act are co-extensive. See Teva Pharm. USA, Inc. v. Pfizer, Inc., 395 F.3d 1324, 1340 (Fed.Cir.2005).